Hillsborough
No. 85-015

HEATHER B. SMITH b/m/n/f LINDA J. SMITH

AND LINDA J. SMITH

v.

NORMAN R. COTE, M.D., *& a.*

July 9, 1986

232

*Brown and Nixon P.A.*, of Manchester (*Frank E. Kenison* on the brief and orally), for the plaintiffs.

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*Gregory G. Peters & a.* on the brief, and *Theodore Wadleigh* orally), 'for the defendants.

BATCHELDER, J.   In this interlocutory transfer of questions arising in a medical malpractice case, we address for the first time two difficult and troubling areas of the law of prenatal torts: wrongful birth and wrongful life.

The transferred record discloses the following facts. Plaintiff Linda J. Smith became pregnant early in 1979. During the course of her pregnancy Linda was under the care of the defendants, physicians who specialize in obstetrics and gynecology. Linda consulted the defendants on April 8, 1979, complaining of nausea, abdominal pain and a late menstrual period. The defendants prescribed Keflex, an antibiotic, and recommended that Linda undergo a pregnancy test if her menstrual period did not begin. Two days later, Linda again consulted the defendants, complaining of an itchy rash and a slight fever. The defendants diagnosed Linda's condition as an allergic reaction to Keflex. Some time thereafter, the defendants determined that she was pregnant.

On August 3, 1979, nearly four months after the April visits, Linda underwent a rubella titre test at the direction of the defendants. The test indicated that Linda had been exposed to rubella. At the time the test was performed, Linda was in the second trimester of pregnancy.

Linda brought her pregnancy to full term. On January 1, 1980, she gave birth to a daughter, Heather B. Smith, who is also a plaintiff in this action. Heather was born a victim of congenital rubella syndrome. Today, at age six, Heather suffers from bilateral cataracts, multiple congenital heart defects, motor retardation, and a significant hearing impairment. She is legally blind, and has undergone surgery for her cataracts and heart condition.

In March 1984 the plaintiffs began this negligence action. They allege that Linda contracted rubella early in her pregnancy and that, while she was under the defendants' care, the defendants negligently failed to test for and discover in a timely manner her exposure to the disease. The plaintiffs further contend that the defendants negligently failed to advise Linda of the potential for birth defects in a fetus exposed to rubella, thereby depriving her of the knowledge necessary to an informed decision as to whether to give birth to a potentially impaired child. For purposes of this opinion, we will construe the writ as alleging that the acts or omissions forming the basis of this action occurred in April 1979.

The plaintiffs do not allege that the defendants caused Linda to conceive her child or to contract rubella, or that the defendants could have prevented the effects of the disease on the fetus. Rather, the plaintiffs contend that if Linda had known of the risks involved she would have obtained a eugenic abortion.

The action comprises three counts, only two of which are relevant here. In Count I, Linda seeks damages for her emotional distress, for the extraordinary maternal care that she must provide Heather

because of Heather's birth defects, and for the extraordinary medical and educational costs she has sustained and will sustain in rearing her daughter. In Count II, Linda seeks damages, under the parental bystander doctrine enunciated in *Corso v. Merrill*, 119 N.H. 647, 406 A.2d 300 (1979), for the emotional injury, including depression, attributable to the impact of her observation of Heather's defects at and after Heather's birth. The validity of Count II is not among the transferred questions, and we express no opinion as to this aspect of the writ. In Count III, Heather seeks damages for her birth with defects, for the extraordinary medical and educational costs she will sustain, and for the impairment of her childhood attributable to her mother's diminished capacity to nurture her and cope with her problems.

The defendants moved to dismiss all three counts, contending that the plaintiffs had failed to state a claim for which relief could be granted, and that New Hampshire law does not recognize the plaintiffs' asserted causes of action. Without ruling on the motion, the Superior Court (*Wyman*, J.) transferred to us the following questions of law:

"A. Will New Hampshire Law recognize a wrongful birth cause of action by the mother of a wilfully conceived baby suffering from birth defects, against a physician on the grounds that the physician negligently failed to test for and discover that the mother had rubella, failed to advise the mother as to the risks of potential birth defects in a fetus exposed to rubella, and thereby deprived the mother of the information on which she would have had an abortion to prevent the birth of her deformed child, where the physician did not cause the baby's conception, and did not cause the deformities in the unborn fetus?

B. If the answer to question A is in the affirmative, will New Hampshire law allow recovery in such a cause of action for damages for emotional distress, extraordinary maternal child care, and the extraordinary medical, institutional and other special rearing expenses necessary to treat the child's impairments?

C. Will New Hampshire law recognize a cause of action for wrongful life brought by a minor child suffering from birth defects against a physician on the grounds that the physician negligently failed to test for, discover, and advise the child's mother as to the mother's having rubella and as to information concerning the potential effects of rubella on her unborn fetus, which failure allegedly

caused the mother not to abort the fetus, thereby causing the plaintiff child to live and exist with mental and physical deformities?

D. If the answer to question C is in the affirmative, what general and specific damages may the child recover in such an action?"

At the outset we emphasize that in deciding this case we express no opinion as to whether the plaintiffs ultimately should prevail in this action.

We recognize that the termination of pregnancy involves controversial and divisive social issues. Nonetheless, the Supreme Court of the United States has held that a woman has a constitutionally secured right to terminate a pregnancy. *Roe v. Wade*, 410 U.S. 113 (1973). It follows from *Roe* that the plaintiff Linda Smith may seek, and the defendants may provide, information and advice that may affect the exercise of that right. The basic social and constitutional issue underlying this case thus has been resolved; we need not cover ground already traveled by a court whose interpretation of the National Constitution binds us. Today we decide only whether, given the existence of the right of choice recognized in *Roe*, our common law should allow the development of a duty to exercise care in providing information that bears on that choice.

■ For the sake of terminological clarity, we make some preliminary distinctions. A wrongful birth claim is a claim brought by the parents of a child born with severe defects against a physician who negligently fails to inform them, in a timely fashion, of an increased possibility that the mother will give birth to such a child, thereby precluding an informed decision as to whether to have the child. *See Phillips v. United States*, 508 F. Supp. 544, 545 n.1 (D.S.C. 1981). The parents typically claim damages for their emotional distress and for some or all of the costs of raising the child. *Id.* We regard Count I of the plaintiffs' writ as alleging a claim for wrongful birth.

■ A wrongful life claim, on the other hand, is brought not by the parents of a child born with birth defects, but by or on behalf of the child. The child contends that the defendant physician negligently failed to inform the child's parents of the risk of bearing a defective infant, and hence prevented the parents from choosing to avoid the child's birth. *Phillips v. United States*, 508 F. Supp. 537, 538 n.1 (D.S.C. 1980). The child typically claims damages for the extraordinary medical, educational, and institutional costs that it will sustain. We regard Count III of the plaintiffs' writ as a claim for wrongful life.

I. *Wrongful Birth: Cause of Action*

We first must decide whether New Hampshire law recognizes a cause of action for wrongful birth. Although we have never expressly recognized this cause of action, we have considered a similar claim, one for "wrongful conception." In *Kingsbury v. Smith*, 122 N.H. 237, 442 A.2d 1003 (1982), the plaintiffs, a married couple, had had three children and wanted no more. In an attempt to prevent the conception of additional offspring, Mrs. Kingsbury underwent a tubal ligation. The operation failed, however, and Mrs. Kingsbury later gave birth to a fourth child, a normal, healthy infant. The plaintiffs sued the physicians who had performed the operation, alleging that in giving birth to an unwanted child they had sustained an injury caused by the defendants' negligence.

We held that the common law of New Hampshire permitted a claim for wrongful conception, an action "for damages arising from the birth of a child to which a negligently performed sterilization procedure or a negligently filled birth control prescription which fails to prevent conception was a contributing factor." *Id.* at 240, 442 A.2d at 1004 (citations omitted). We reasoned that failure to recognize a cause of action for wrongful conception would leave "a void in the area of recovery for medical malpractice" that would dilute the standard of professional conduct in the area of family planning. *Id.* at 242, 442 A.2d at 1005–06.

In this case, the mother contends that her wrongful birth claim fits comfortably within the framework established in *Kingsbury* and is consistent with well established tort principles. The defendants argue that tort principles cannot be extended so as to accommodate wrongful birth, asserting that they did not cause the injury alleged here, and that in any case damages cannot be fairly and accurately ascertained.

The action for wrongful birth occupies a relatively recent place in the history of tort law. *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689 (1967) is the "fountainhead" for debate in cases of this type. W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 55, at 370 (5th ed. 1984) [hereinafter cited as PROSSER & KEETON]. Like the instant case, *Gleitman* involved claims for wrongful birth and wrongful life arising out of the birth of a child suffering from congenital rubella syndrome. The plaintiff mother, who had contracted rubella early in her pregnancy, alleged that the defendant physicians had failed to inform her that the disease might affect her child, and that had she been so informed she would have undergone an abortion.

The trial judge dismissed both the wrongful life and the wrongful

birth complaints, and the Supreme Court of New Jersey affirmed. The court first disposed of the child's wrongful life claim, holding that the conduct complained of did not give rise to damages cognizable at law. The court explained that it was legally impossible to weigh "the value of life with impairments against the nonexistence of life itself." *Gleitman,* 49 N.J. at 29, 227 A.2d at 692. Turning to the parents' wrongful birth claim, the court emphasized the analytical difficulty posed by the dual character of the consequences of the defendants' alleged negligence. On the one hand, the defendants arguably had caused the plaintiffs to incur child rearing costs and to undergo emotional distress. On the other, the birth of the child had conferred the intangible benefits of parenthood on the plaintiffs. The court found that this difficulty made it impossible to determine compensatory damages. *Id.* at 29–30, 227 A.2d at 693.

The *Gleitman* court also was troubled by the policy implications of recognizing a cause of action for wrongful birth. According to the court, the parents' complaint sought damages for "the denial of the opportunity to take an embryonic life." *Id.* at 30, 227 A.2d at 693. The court reasoned that to allow such a claim would be to deny the "sanctity of the single human life," *id.,* and that the child's right to live exceeded and precluded the parents' right not to endure financial and emotional injury. *Id.* at 31, 227 A.2d at 693. The court concluded that the wrongful birth complaint was not actionable because the defendants' conduct did not give rise to damages cognizable at law, and that, even if such damages were cognizable, the "countervailing public policy supporting the preciousness of human life" precluded the claim. *Id.*

*Gleitman's* influence in wrongful birth cases has considerably diminished during the past two decades. The highest courts of Texas, *see Jacobs v. Theimer,* 519 S.W.2d 846 (Tex. 1975), and Wisconsin, *see Dumer v. St. Michael's Hospital,* 69 Wis. 2d 766, 233 N.W.2d 372 (1975), recognized wrongful birth causes of action in 1975, and three years later the Court of Appeals of New York followed suit. *See Becker v. Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978). In 1979 the Supreme Court of New Jersey overruled *Gleitman* on the issue of wrongful birth. *See Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979). Today there is "quite general agreement" that some recovery should be permitted in wrongful birth cases. *See* PROSSER & KEETON, *supra* § 55, at 371. *See also* Annot., 83 A.L.R.3d 15 (1978 & Supp. 1985). Of the jurisdictions that have considered the issue, only North Carolina refuses to allow recovery. *See Azzolino v. Dingfelder,* 315 N.C. 103, 337 S.E.2d 528 (1985).

Two developments help explain the trend toward judicial accept-

ance of wrongful birth actions. The first is the increased ability of health care professionals to predict and detect the presence of fetal defects. Science's improved capacity to assess risk factors in pregnant women, as well as the development of "sophisticated biochemical and cytogenic tests for assaying amniotic fluid and maternal and fetal blood," have greatly enhanced the importance of reproductive counseling. Capron, *Tort Liability in Genetic Counseling*, 79 COLUM. L. REV. 618, 626 (1979). Amniocentesis, a procedure in which a physician removes, cultures, and tests fetal cells that have been sloughed into the fluid surrounding the fetus in the amniotic sac, is a signal example of one such test. In the early 1970's amniocentesis was regarded as an experimental procedure; by the mid-1970's, it was commonly accepted in medical practice. Rogers, *Wrongful Life and Wrongful Birth: Medical Malpractice in Genetic Counseling and Prenatal Testing*, 33 S.C.L. REV. 713, 720–21 (1982).

*Roe v. Wade*, 410 U.S. 113 (1973), and its progeny constitute the second development explaining the acceptance of wrongful birth actions. Rogers, *supra* at 722–23. In *Roe* the Supreme Court held that the constitutional right of privacy encompasses a woman's decision whether to undergo an abortion. *Roe*, 410 U.S. at 153. During the first trimester of her pregnancy, a woman may make this decision as she sees fit, free from State interference. *Id.* at 163. The Court has repeatedly adhered to this holding in the face of regulatory attempts to circumscribe the *Roe* right of privacy. *See, e.g., Thornburgh v. American College of Obstetricians*, 106 S. Ct. 2169 (1986). As we indicated above, we believe that *Roe* is controlling; we do not hold that our decision would be the same in its absence.

When *Gleitman* was decided, the science of prenatal testing and risk assessment was nascent, and in many States abortions could not legally be obtained. Today, as a result of *Roe* and the advances of science, it is possible for prospective parents (1) to know, well in advance of birth, of the risk or presence of congenital defects in the fetus they have conceived; and (2) to decide to terminate the pregnancy on the basis of this knowledge. Courts accordingly have recognized that physicians who perform testing and provide advice relevant to the constitutionally guaranteed procreative choice, or whose actions could reasonably be said to give rise to a duty to provide such testing or advice, have an obligation to adhere to reasonable standards of professional performance.

■■ With this background in mind, we turn to the first issue before us: whether New Hampshire recognizes a cause of action for wrongful birth. In general, at common law, one who suffers an injury to his person or property because of the negligent act of

another has a right of action in tort. 65A C.J.S. *Negligence* § 175, at 305 (1966). In order to sustain an action for negligence, the plaintiff must establish the existence of a duty, the breach of which proximately causes injury to the plaintiff. *See White v. Schnoebelen*, 91 N.H. 273, 18 A.2d 185 (1941); PROSSER & KEETON, *supra* § 30, at 164–65.

■■ The first two elements of a negligence action, duty and breach, present no conceptual difficulties here. If the plaintiff establishes that a physician-patient relationship with respect to the pregnancy existed between the defendants and her, it follows that the defendants assumed a duty to use reasonable care in attending and treating her. *See Mehigan v. Sheehan*, 94 N.H. 274, 275, 51 A.2d 632, 633 (1947). Given the decision in *Roe v. Wade*, we recognize that the "due care" standard, *see* RSA 508:13, may have required the defendants to ensure that Linda had an opportunity to make an informed decision regarding the procreative options available to her. *Cf. Folger v. Corbett*, 118 N.H. 737, 738, 394 A.2d 63, 63 (1978) (doctor has duty to inform patient of reasonable risks involved in operation of treatment so that patient can make effective choice). It is a question of fact whether this standard required the defendants, at an appropriate stage of Linda's pregnancy, to test for, diagnose, and disclose her exposure to rubella. The standard is defined by reference to the standards and recommended practices and procedures of the medical profession, the training, experience and professed degree of skill of the average medical practitioner, and all other relevant circumstances. RSA 508:13. We note that this standard does not require a physician to identify and disclose every chance, no matter how remote, of the occurrence of every possible birth "defect," no matter how insignificant. *See generally* Editorial Note, *Genetic Malpractice: Avoiding Liability*, 54 U. CIN. L. REV. 857 (1986). If (1) the applicable standard of care required the defendants to test for and diagnose Linda's rubella infection in a timely manner, and to inform her of the possible effects of the virus on her child's health; and (2) the defendants failed to fulfill this obligation, then the defendants breached their duty of due care.

The third element, causation, is only slightly more troublesome. The defendants point out that proof that they caused the alleged injury depends on a finding that Linda would have chosen to terminate her pregnancy if she had been fully apprised of the risks of birth defects. The defendants argue that this hypothetical chain of events is too remote to provide the basis for a finding of causation.

■ We do not agree. No logical obstacle precludes proof of causation in the instant case. Such proof is furnished if the plaintiff can

show that, but for the defendants' negligent failure to inform her of the risks of bearing a child with birth defects, she would have obtained an abortion. *See Robak v. United States*, 658 F.2d 471, 477 (7th Cir. 1981); *Eisbrenner v. Stanley*, 106 Mich. App. 357, 366–67, 308 N.W.2d 209, 213 (1981); Note, *Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling*, 87 YALE L.J. 1488, 1509–10 (1978). To be sure, establishment of causation will depend on proof of a counterfactual, *i.e.*, had Linda been properly informed, she would have chosen to terminate her pregnancy. This circumstance, however, does not entail inability to establish such proof; it is present in every informed consent case involving a subjective standard of causation. *See McPherson v. Ellis*, 305 N.C. 266, 272–73, 287 S.E.2d 892, 896–97 (1982) (jury in informed consent case may consider plaintiffs' testimony as to what her decision would have been had she been properly informed of risks of operation).

We turn to the final element of a negligence action, injury. Linda contends that, in bearing a defective child after being deprived of the opportunity to make an informed procreative decision, she sustained an injury. The defendants argue that, because both benefits (the joys of parenthood) and harms (the alleged emotional and pecuniary damages) have resulted from Heather's birth, damages cannot accurately be measured, and no injury to Linda can be proved. The defendants in effect assert that the birth of a child can never constitute an injury to its parents; hence, when an actor's negligence causes a child to be born, that actor cannot be held liable in tort.

We do not agree. We recognize, as we did in *Kingsbury*, that in some circumstances parents may be injured by the imposition on them of extraordinary liabilities following the birth of a child. Under *Roe*, prospective parents may have constitutionally cognizable reasons for avoiding the emotional and pecuniary burdens that may attend the birth of a child suffering from birth defects. Scientific advances in prenatal health care provide the basis upon which parents may make the informed decisions that *Roe* protects. We see no reason to hold that as a matter of law those who act negligently in providing such care cannot cause harm, and hence are immune from suit. Such a holding would "leave[ ] a void in the area of recovery for medical malpractice and dilute[ ] the standard of professional conduct" in a growing and increasingly important professional field. *See Kingsbury*, 122 N.H. at 242, 442 A.2d at 1005.

The defendants' emphasis on the inherent difficulty of measuring damages is misplaced. An allegation of "injury," an instance of actionable harm, is distinct from a claim for "damages," a sum of

money awarded to one who has suffered an injury. We have long held that difficulty in calculating damages is not a sufficient reason to deny recovery to an injured party. *Baker v. Dennis Brown Realty, Inc.*, 121 N.H. 640, 646, 433 A.2d 1271, 1275 (1981). Other courts have recognized that the complexity of the damages calculation in a wrongful birth case is not directly relevant to the validity of the asserted cause of action. *E.g.*, *Phillips v. United States*, 508 F. Supp. 544, 550 (D.S.C. 1981).

We hold that New Hampshire recognizes a cause of action for wrongful birth. Notwithstanding the disparate views within society on the controversial practice of abortion, we are bound by the law that protects a woman's right to choose to terminate her pregnancy. Our holding today neither encourages nor discourages this practice, *see Speck v. Finegold*, 439 A.2d 110, 118 n.2 (Pa. 1981) (Kauffman, J., concurring), nor does it rest upon a judgment that, in some absolute sense, Heather Smith should never have been born. *See id.* at 118 n.3. We cannot (and need not, for purposes of this action) make such a judgment. We must, however, do our best to effectuate the first principles of our law of negligence: to deter negligent conduct, and to compensate the victims of those who act unreasonably.

## II. *Wrongful Birth: Damages*

We next must decide what elements of damages may be recovered in a wrongful birth action. The wrongful birth cause of action is unique. Although it involves an allegation of medical malpractice, it is not (as are most medical malpractice cases) a claim arising from physical injury. It is instead based on a negligent invasion of the parental right to decide whether to avoid the birth of a child with congenital defects. When parents are denied the opportunity to make this decision, important personal interests may be impaired, including an interest in avoiding the special expenses necessitated by the condition of a child born with defects, an interest in preventing the sorrow and anguish that may befall the parents of such a child, and an interest in preserving personal autonomy, which may include the making of informed reproductive choices. *See* Kelley, *Wrongful Life, Wrongful Birth, and Justice in Tort Law*, 1979 WASH. U.L.Q. 919, 943. The task of assessing and quantifying the tangible and intangible harms that result when these interests are impaired presents a formidable challenge.

Linda seeks compensation for the extraordinary medical and educational costs that she will sustain in raising Heather, as well as for the extraordinary maternal care that she must provide her child. In

addition, she asks for damages for her "emotional distress, anxiety and trauma," which she claims is a natural and foreseeable consequence of the injury she has sustained, and hence should be included as an essential element in the calculation of general damages. We consider these claims for tangible and intangible losses in turn.

## A. Tangible Losses

The usual rule of compensatory damages in tort cases requires that the person wronged receive a sum of money that will restore him as nearly as possible to the position he would have been in if the wrong had not been committed. *Emery v. Caledonia Sand & Gravel Co.*, 117 N.H. 441, 447, 374 A.2d 929, 933 (1977). In the present case, if the defendants' failure to advise Linda of the risks of birth defects amounted to negligence, then the reasonably foreseeable result of that negligence was that Linda would incur the expenses involved in raising her daughter. According to the usual rule of damages, then, Linda should recover the entire cost of raising Heather, including both ordinary child-rearing costs and the extraordinary costs attributable to Heather's condition.

However, "few if any jurisdictions appear ready to apply this traditional rule of damages with full vigor in wrongful birth cases." *Azzolino v. Dingfelder*, 337 S.E.2d 528, 534 (N.C. 1985). Although at least one court has ruled that all child-rearing costs should be recoverable, *Robak v. United States*, 658 F.2d 471, 478–79 (7th Cir. 1981), most courts are reluctant to impose liability to this extent. A special rule of damages has emerged; in most jurisdictions the parents may recover only the extraordinary medical and educational costs attributable to the birth defects. *James G. v. Caserta*, 332 S.E.2d 872, 882 (W. Va. 1985). In the present case, in accordance with the rule prevailing elsewhere, Linda seeks to recover, as tangible losses, only her extraordinary costs.

The logic of the "extraordinary costs" rule has been criticized. *See Becker v. Schwartz*, 46 N.Y.2d 401, 421–22, 386 N.E.2d 807, 818, 413 N.Y.S.2d 895, 907 (1978) (Wachtler, J., dissenting in part). The rule in effect divides a plaintiff's pecuniary losses into two categories, ordinary costs and extraordinary costs, and treats the latter category as compensable while ignoring the former category. At first glance, this bifurcation seems difficult to justify.

The disparity is explained, however, by reference to the rule requiring mitigation of tort damages. The "avoidable consequences" rule, RESTATEMENT (SECOND) OF TORTS § 918 (1979), specifies that a plaintiff may not recover damages for "any harm that he could have avoided by the use of reasonable effort or expenditure" after the occurrence of the tort. Rigidly applied, this rule would appear to

require wrongful birth plaintiffs to place their children for adoption. *See* Note, *Wrongful Birth: The Avoidance of Consequences Doctrine in Mitigation of Damages*, 53 FORDHAM L. REV. 1107 (1985). Because of our profound respect for the sanctity of the family, *see In re Adoption of Baby C.*, 125 N.H. 216, 220, 480 A.2d 101, 103 (1984), we are loathe to sanction the application of the rule in these circumstances. If the rule is not applied, however, wrongful birth plaintiffs may receive windfalls. Hence, a special rule limiting recovery of damages is warranted.

Although the extraordinary costs rule departs from traditional principles of tort damages, it is neither illogical nor unprecedented. The rule represents an application in a tort context of the expectancy rule of damages employed in breach of contracts cases. Wrongful birth plaintiffs typically desire a child (and plan to support it) from the outset. Capron, *supra* at 638–39 n.91. It is the defendants' duty to help them achieve this goal. When the plaintiffs' expectations are frustrated by the defendants' negligence, the extraordinary costs rule "merely attempts to put plaintiffs in the position they *expected* to be in with defendant's help." Kelley, *supra* at 954.

Under this view of the problem, ordinary child-rearing costs are analogous to a price the plaintiffs were willing to pay in order to achieve an expected result. According to contract principles, plaintiffs "may not have a return in damages of the price and also receive what was to be obtained for the price." *McQuaid v. Michou*, 85 N.H. 299, 303, 157 A. 881, 883 (1932). *See Hawkins v. McGee*, 84 N.H. 114, 146 A. 641 (1929). We note that expectancy damages are recoverable in other kinds of tort cases, *see Wilson v. Came*, 116 N.H. 628, 630, 366 A.2d 474, 475 (1976) (negligent misrepresentation), and that contract principles are hardly unknown in medical malpractice litigation, which has roots in contract as well as in tort. *See Lakeman v. LaFrance*, 102 N.H. 300, 304–05, 156 A.2d 123, 127 (1959); Kelley, *supra* at 954. In light of the difficulty posed by tort damages principles in these circumstances, we see no obstacle—logical or otherwise—to use of the extraordinary costs rule. *See* Kelley, *supra* at 954.

The extraordinary costs rule ensures that the parents of a deformed child will recover the medical and educational costs attributable to the child's impairment. At the same time it establishes a necessary and clearly defined boundary to liability in this area. *See Nutter v. Frisbie Memorial Hospital*, 124 N.H. 791, 795, 474 A.2d 584, 586 (1984). Accordingly, we hold that a plaintiff in a wrongful birth case may recover the extraordinary medical and educational costs attributable to the child's deformities, but may not recover ordinary child-raising costs.

■ Three points stand in need of clarification. First, parents may recover extraordinary costs incurred both before and after their child attains majority. Some courts do not permit recovery of post-majority expenses, on the theory that the parents' obligation of support terminates when the child reaches twenty-one. *E.g., Bani-Esraili v. Wald*, 127 Misc. 2d 202, 485 N.Y.S.2d 708 (Sup. Ct. 1985). In New Hampshire, however, parents are required to support their disabled adult offspring. *See Campbell v. Cooper*, 34 N.H. 49, 62–63 (1856); *Town of Orford v. Town of Rumney*, 3 N.H. 331 (1825); RSA 546-A:2; C. DOUGLAS, 3 NEW HAMPSHIRE PRACTICE, FAMILY LAW § 307 (1982). *Accord Blake v. Cruz*, 698 P.2d 315, 321 (Idaho 1984); *James G. v. Caserta*, 332 S.E.2d 872, 882–83 (W. Va. 1985).

■ Second, recovery should include compensation for the extraordinary maternal care that has been and will be provided to the child. Linda alleges that her parental obligations and duties, which include feeding, bathing, and exercising Heather, substantially exceed those of parents of a normal child. One court has ruled that parents "cannot recover for services that they have rendered or will render personally to their own child without incurring financial expense." *Schroeder v. Perkel*, 87 N.J. 53, 69, 432 A.2d 834, 841 (1981). We see no reason, however, to treat as noncompensable the burdens imposed on a parent who must devote extraordinary time and effort to caring for a child with birth defects. *Cf. Ernshaw v. Roberge*, 86 N.H. 451, 456, 170 A. 7, 9–10 (1934) (father of injured child may recover value of care provided by mother); *Connell v. Putnam*, 58 N.H. 534 (1879) (father of injured child may recover value of nursing and care he provides). Avoiding these burdens is often among the primary motivations of one who chooses not to bear a child likely to suffer from birth defects. We hold that a parent may recover for his or her ministrations to his or her child to the extent that such ministrations:

(1) are made necessary by the child's condition;

(2) clearly exceed those ordinarily rendered by parents of a normal child; and

(3) are reasonably susceptible of valuation.

The trial judge should not allow the jury to consider such a claim unless there is concrete evidence indicating the probable nature and extent of the extra services that will be required. If the issue is submitted to the jury, the trial judge must instruct that damages for this purpose are not to be awarded as an expression of sympathy.

■ Third, to the extent that the parent's alleged emotional distress results in tangible pecuniary losses, such as medical expenses or counseling fees, such losses are recoverable. *See Holyoke v. Grand*

*Trunk Railway,* 48 N.H. 541 (1869); Miller, *The Scope of Liability for Negligent Infliction of Emotional Distress: Making "the Punishment Fit the Crime,"* 1 U. HAWAII L. REV. 1, 39–40 (1979).

## B. Intangible Losses

▇▇▇ Existing damages principles do not resolve the issue whether recovery for emotional distress should be permitted in wrongful birth cases. Emotional distress damages are not uniformly recoverable once a protected interest is shown to have been invaded. *Compare Holyoke v. Grand Trunk Ry.*, 48 N.H. 541, 545 (1869) (plaintiff may recover for actual mental suffering in personal injury case) *with Crowley v. Global Realty, Inc.*, 124 N.H. 814, 818, 474 A.2d 1056, 1058 (1984) (plaintiffs cannot recover for emotional distress in claim for negligent misrepresentation).

We look primarily to two analogous cases for guidance. In *Prescott v. Robinson*, 74 N.H. 460, 69 A. 522 (1908), a pregnant woman was injured in an automobile accident caused by the defendant's negligence. Her child was subsequently born permanently deformed. The woman brought an action for personal injuries in which she sought to recover for the mental distress she had suffered and would continue to suffer on account of her child's condition. We held that she could not recover for her post-natal emotional distress. *Id.* at 464–66, 69 A. at 524–25.

In *Siciliano v. Capital City Shows, Inc.*, 124 N.H. 719, 475 A.2d 19 (1984), an amusement ride accident resulted in the death of one child and cerebral injuries to another. The parents of the children sued, claiming damages for the loss of the society of their respective children. We held that the plaintiffs failed to state a cause of action. *Id.* at 728, 475 A.2d at 24.

▇▇▇ *Prescott* and *Siciliano* illustrate our reluctance to permit parents of children injured or killed as a result of negligent conduct to recover for their consequent emotional distress. *See* RESTATEMENT (SECOND) OF TORTS § 703, comment h (1977). This reluctance does not stem from uncertainties about the causal relation between the negligent conduct at issue and a parent's distress, or from a failure to appreciate the intensity of the sorrow and anguish that a parent experiences when her child suffers harm. *Prescott* and *Siciliano* were founded, instead, on a practical consideration: the need to establish a clearly defined limit to the scope of negligence liability in this area. "Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree." *Nutter v. Frisbie Memorial Hospital*, 124 N.H. 791, 794, 474 A.2d 584, 586 (1984) (quoting *Tobin v. Grossman*, 24 N.Y.2d 609, 619, 249 N.E.2d

419, 424, 301 N.Y.S.2d 554, 561 (1969)). When a child dies or is injured as the result of negligent conduct, the law ordinarily treats the child's pain and suffering as a direct and compensable result of that conduct, and the parents' emotional distress as an indirect and non-compensable result. *But see Corso v. Merrill*, 119 N.H. 647, 406 A.2d 300 (1979).

This case arises from a child's birth, not a child's injury or death. Nonetheless, we are struck by the parallels between the claims for emotional distress in *Prescott* and *Siciliano* and the claim before us. Moreover, we are mindful of the anomaly that would result were we to treat parental emotional distress as compensable. The negligent conduct at issue in *Prescott* and *Robinson* was the direct cause of injuries to or the death of otherwise healthy children. By contrast, in wrongful birth cases the defendant's conduct results, not in injuries or death, but in the birth of an unavoidably impaired child. It would be curious, to say the least, to impose liability for parental distress in the latter but not the former cases.

We also harbor concerns of proportionality. "[T]he unfairness of denying recovery to a plaintiff on grounds that are arbitrary in terms of principle may be outweighed by the perceived unfairness of imposing a burden on defendant that seems much greater than his fault would justify." Miller, *supra* at 20 n.111. We already have held that a wrongful birth defendant is liable for the pecuniary losses incurred by the parents. Were we additionally to impose liability for parents' emotional distress, we would run the risk of penalizing and overdeterring merely negligent conduct.

We hold that damages for emotional distress are not recoverable in wrongful birth actions. *Accord Moores v. Lucas*, 405 So. 2d 1022, 1026 (Fla. Dist. Ct. App. 1981); *Becker v. Schwartz*, 46 N.Y.2d 401, 413–15, 386 N.E.2d 807, 813, 413 N.Y.S.2d 895, 901–02 (1978); *Jacobs v. Theimer*, 519 S.W.2d 846, 849 (Tex. 1975).

## III. *Wrongful Life*

The theory of Heather's wrongful life action is as follows: during Linda's pregnancy the defendants owed a duty of care to both Linda and Heather. The defendants breached this duty when they failed to discover Linda's exposure to rubella and failed to advise her of the possible effects of that exposure on her child's health. Had Linda been properly informed, she would have undergone an abortion, and Heather would not have been born. Because Linda was not so informed, Heather must bear the burden of her afflictions for the rest of her life. The defendants' conduct is thus the proximate cause of injury to Heather.

■ This theory presents a crucial problem, however: the question of injury. It is axiomatic that there is no cause of action for negligence unless and until there has been an injury. *White v. Schnoebelen*, 91 N.H. 273, 274, 18 A.2d 185, 186 (1941). "Injury" denotes an "invasion of any legally protected interest of another." RESTATEMENT (SECOND) OF TORTS § 7(1) (1965). In the present case Heather claims to have had an interest in avoiding "the lifetime of suffering inflicted on [her] by [her] condition." Rogers, *supra* at 716. In order to recognize Heather's wrongful life action, then, we must determine that the fetal Heather had an interest in avoiding her own birth, that it would have been best *for Heather* if she had not been born.

This premise of the wrongful life action—that the plaintiff's own birth and suffering constitute legal injury—has caused many courts to decline to recognize the claim. *See* Annot., 83 A.L.R.3d 15 (1978 & Supp. 1985). According to the Supreme Court of Texas, the perplexities involved in comparing the relative benefits of life and nonexistence render it "impossible" to decide the question of injury. *Nelson v. Krusen*, 678 S.W.2d 918, 925 (Tex. 1984). The notion that nonexistence may be preferable to life with severe birth defects appears to contravene the policy favoring "the preciousness and sanctity of human life." *Phillips v. United States*, 508 F. Supp. 537, 543 (D.S.C. 1980). As one court has written,

> "[w]hether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians. Surely the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence."

*Becker v. Schwartz*, 46 N.Y.2d 401, 411, 386 N.E.2d 807, 812, 413 N.Y.S.2d 895, 900 (1978).

Moreover, compelling policy reasons militate against recognition of wrongful life claims. The first such reason is our conviction that the courts of this State should not become involved in deciding whether a given person's life is or is not worthwhile. As one commentator has written, "[i]f plaintiff prevails, the result is a formal judicial declaration that it would have been better if plaintiff had not been born." Kelley, *supra* at 942. The right to life, and the principle that all are equal under the law, are basic to our constitutional order. N.H. CONST. pt. I, arts. 1, 2. To presume to decide that Heather's life is not worth living would be to forsake these ideals.

Our reluctance to decide whether Heather's birth constitutes an

injury is not diminished by the evolving "right to die" doctrine. *See, e.g., In re Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976). In a right to die case a court may act to protect an individual's right to choose between a natural death and the prolongation of his life by means of extraordinary medical procedures. The court avoids making an objective judgment as to the value of the plaintiff's life; it strives, instead, to protect the individual's subjective will. Even when the plaintiff is an incompetent, "the court does not arrogate to itself the individual's choice," but instead allows the plaintiff's guardian or surrogate to make that choice on his behalf. *Procanik v. Cillo*, 97 N.J. 339, 367, 478 A.2d 755, 771 (1984) (Handler, J., concurring in part and dissenting in part).

The same cannot be said of wrongful life cases. At issue is not protection of the impaired child's right to choose nonexistence over life, but whether legal injury has occurred as a result of the defendant's conduct. The necessary inquiry is objective, not subjective; the court cannot avoid assessing the "worth" of the child's life. Simply put, the judiciary has an important role to play in protecting the privacy rights of the dying. It has no business declaring that among the living are people who never should have been born.

The second policy reason militating against recognition of Heather's claim is related to the first.

> "[L]egal recognition that a disabled life is an injury would harm the interests of those most directly concerned, the handicapped. Disabled persons face obvious physical difficulties in conducting their lives. They also face subtle yet equally devastating handicaps in the attitudes and behavior of society, the law, and their own families and friends. Furthermore, society often views disabled persons as burdensome misfits. Recent legislation concerning employment, education, and building access reflects a slow change in these attitudes. This change evidences a growing public awareness that the handicapped can be valuable and productive members of society. To characterize the life of a disabled person as an injury would denigrate both this new awareness and the handicapped themselves."

Comment, *Wrongful Life: A Misconceived Tort*, 15 U.C.D. L. REV. 447, 459–60 (1981) (footnotes omitted).

The third reason stems from an acknowledgment of the limitations of tort law and the adjudicative process. Wrongful life actions are premised on the ability of judges and juries accurately to apply the traditional tort concept of injury to situations involving complex

medical and bioethical issues. Yet this concept applies only roughly. In the ordinary tort case the *existence* of injury is readily and objectively ascertainable. In wrongful life cases, however, the finding of injury necessarily hinges upon subjective and intensely personal notions as to the intangible value of life. *Cf.* Minow, *Beyond State Intervention in the Family: For Baby Jane Doe*, 18 U. MICH. J.L. REF. 933, 961–66 (1985) (describing difficulty of making quality of life judgments regarding handicapped newborns). The danger of markedly disparate and, hence, unpredictable outcomes is manifest.

In deciding whether to recognize a new tort cause of action, we must consider the "defendant's interest in avoiding an incorrect judgment of liability because of the court's incompetence to determine certain questions raised by application of the announced standard." Kelley, *supra* at 930. Wrongful life claims present problems that cannot be resolved in a "reasonably sensible, even-handed, and fair" manner from case to case. Miller, *supra* at 33. As Chief Justice Weintraub of the Supreme Court of New Jersey recognized nearly twenty years ago, "[t]o recognize a right not to be born is to enter an area in which no one could find his way." *Gleitman v. Cosgrove*, 49 N.J. 22, 63, 227 A.2d 689, 711 (1967) (Weintraub, C.J., dissenting in part).

The high courts of three States have adopted a special approach in wrongful life cases. *See Turpin v. Sortini*, 31 Cal. 3d 220, 643 P.2d 954, 182 Cal. Rptr. 337 (1982); *Procanik v. Cillo*, 97 N.J. 339, 478 A.2d 755 (1984); *Harbeson v. Parke-Davis, Inc.*, 98 Wash. 2d 460, 656 P.2d 483 (1983). In *Turpin* a child suffering from hereditary deafness sued to recover (1) general damages for the deprivation of her right "to be born as a whole, functional human being without total deafness" and (2) special damages for extraordinary expenses for specialized training, teaching and hearing equipment that she would incur during her lifetime. *Turpin*, 31 Cal. 3d at 224, 643 P.2d at 956, 182 Cal. Rptr. at 339. The court denied the claim for general damages, concluding that it was impossible to determine whether the child had been injured, or to assess general damages in a fair, nonspeculative manner. *Id.* at 235, 643 P.2d at 963, 182 Cal. Rptr. at 346.

The court allowed recovery of the claimed special damages, however. It reasoned that "it would be illogical and anomalous to permit only parents, and not the child, to recover for the cost of the child's own medical care." *Id.* at 238, 643 P.2d at 965, 182 Cal. Rptr. at 348. The court noted that if the parents alone were allowed a right of action, recovery of medical expenses for the child "might well depend on the wholly fortuitous circumstance of whether the parents are available to sue and recover such damages or whether the

medical expenses are incurred at a time when the parents remain legally responsible for providing such care." *Id.* The court cited several other reasons for permitting recovery of special damages:

(1) the defendants' negligence placed a medical burden on the whole family unit, not just the parents;

(2) the claimed special damages were certain and readily measurable; and

(3) recovery of such damages would be vital to the child's survival.

*Id.* at 238, 643 P.2d at 965, 182 Cal. Rptr. at 348. Similar results were reached in *Procanik*, 97 N.J. at 351–52, 478 A.2d at 762, and *Harbeson*, 98 Wash. 2d at 482, 656 P.2d at 496–97.

We recognize that this approach represents a sincere and sympathetic judicial response to the plight of children whose frightfully burdened lives might have been prevented. Legal niceties aside, the reality of the situation in wrongful life cases is that a child both "*exists* and *suffers*, due to the negligence of others." *Curlender v. Bio-Science Laboratories*, 106 Cal. App. 3d 811, 829, 165 Cal. Rptr. 477, 488 (1980). The essence of the *Turpin* rule is that logic should not defeat the claim of a severely impaired child in need of help.

Moreover, we are mindful that controversy regarding the *Turpin* rule may have little practical significance when recovery for wrongful *birth* is permitted. The same extraordinary expenses *Turpin* would allow in wrongful life actions are covered by our rule allowing parental recovery of post-majority expenses. Because such expenses cannot be recovered by both parent and child, the net effect is the same. Recognition of the wrongful life action would make a substantial difference only in limited circumstances, as when the statute of limitations bars the parental but not the filial claim (as in *Procanik*) or when the parents are unavailable to sue.

Even if adoption of the *Turpin* rule would have no practical consequences in the majority of cases, however, the doctrinal and symbolic implications of the rule are significant. Its primary deficiency is that it imposes liability even if the defendant has caused no harm. If the child cannot prove injury,

> "it is unfair and unjust to charge the doctors with the infant's medical expenses. The position that the child may recover special damages despite the failure of his underlying theory of wrongful life violates the moral code underlying our system of justice from which the fundamental principles of tort law are derived."

*Procanik v. Cillo,* 97 N.J. 339, 370, 478 A.2d 755, 772 (1984)

(Schreiber, J., dissenting in part). Were we to permit a waiver of the injury requirement in this negligence action, it would be "difficult to envision any principled basis for refusing to extend the reasoning to other elements and other situations." *Nelson v. Krusen*, 678 S.W.2d 918, 931 (Tex. 1984) (Robertson, J., concurring).

■ Unlike the *Turpin, Procanik,* and *Harbeson* courts, we perceive no anomaly in permitting the parents but not the child to recover the medical and educational expenses attributable to the child's impairments. This result obtains because the loss at issue is the parents', not the child's. A parent is liable for a minor's medical expenses when the minor is living with or supported by the parents. Hence the parent, and not the child, may recover the medical expenses of a minor child injured by another. *Blue Cross/Blue Shield of New Hampshire-Vermont v. St. Cyr*, 123 N.H. 137, 141, 459 A.2d 227, 228–29 (1983). If the parent has sustained an ascertainable injury, the right of recovery is properly hers. In permitting a child to recover for her parents' injury, the *Turpin* rule contravenes the principle that "negligence as a legal source of liability gives rise only to an obligation to compensate the person immediately injured." *Norwest v. Presbyterian Intercommunity Hospital*, 293 Or. 543, 569, 652 P.2d 318, 333 (1982).

We recognize that our rejection of the *Turpin* rule is not without cost. In the future, recovery of an impaired child's necessary medical expenses may well depend on whether the child's parents are available to assert a claim for wrongful birth. *See Turpin*, 31 Cal. 3d at 238, 643 P.2d at 965, 182 Cal. Rptr. at 348. But this cost is the price of our paramount regard for the value of human life, and of our adherence to fundamental principles of justice. We will not recognize a right not to be born, and we will not permit a person to recover damages from one who has done him no harm.

■ We decline to recognize a cause of action for wrongful life.

IV. *Conclusion*

We answer the transferred questions as follows:

A. New Hampshire recognizes a cause of action for wrongful birth.

B. The damages that may be recovered are the extraordinary medical and educational costs of raising the impaired child. Such damages should reflect costs that will be incurred both before and after the child attains majority, and should include compensation for extraordinary parental care. In addition, the mother may recover her tangible losses attributable to her emotional distress.

C. New Hampshire does not recognize a cause of action for wrongful life.

We do not reach the issue raised in the special concurrence of Souter, J., because it has not been raised, briefed, or argued in the record before us.

*Remanded.*

KING, C.J., did not sit; SOUTER, J., concurred specially; the others concurred.

SOUTER, J., concurring: I concur in the majority opinion and add this further word, not because that opinion fails to respond to the questions transferred to us, but because those questions fail to raise a significant issue in the area of malpractice litigation that we address today. The trial court did not ask whether, or how, a physician with conscientious scruples against abortion, and the testing and counselling that may inform an abortion decision, can discharge his professional obligation without engaging in procedures that his religious or moral principles condemn. To say nothing about this issue could lead to misunderstanding.

In response to the questions transferred, the court holds that a sphere of medical practice necessarily permitted under *Roe v. Wade*, 410 U.S. 111 (1973), is not exempt from standards of reasonable medical competence. Consequently we hold that the plaintiff alleges a violation of the physician's duty when she claims, in the circumstances of the case, that prevailing standards of medical practice called for testing and advice, which the defendants failed to provide.

It does not follow, however, and I do not understand the court to hold, that a physician can discharge the obligation of due care in such circumstances only by personally ordering such tests and rendering such advice. The court does not hold that some or all physicians must make a choice between rendering services that they morally condemn and leaving their profession in order to escape malpractice exposure. The defensive significance, for example, of timely disclosure of professional limits based on religious or moral scruples, combined with timely referral to other physicians who are not so constrained, is a question open for consideration in any case in which it may be raised. *See* Note, *Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling*, 87 YALE L. J. 1488, 1510–12 (1978) (The Physician as Conscientious Objector); Editorial Note, *Genetic Malpractice: Avoiding Liability*, 54 U. CIN. L. REV. 857, 869 (1986) (Failure to Refer to Genetic Counselor).