Rockingham
No. 2003-790

### RICHARD L. MAILLOUX

### v.

### TOWN OF LONDONDERRY & a.

Argued: October 20, 2004
Opinion Issued: December 28, 2004

*Wadleigh, Starr & Peters, P.L.L.C.*, of Manchester (*Todd Hathaway* and *Stephen L. Boyd* on the brief, and *Mr. Hathaway* orally), for the petitioner.

*Upton & Hatfield, LLP*, of Concord (*Barton L. Mayer* on the brief and orally), for respondent Town of Londonderry.

GALWAY, J. Respondent Town of Londonderry (Town), appeals an order of the Superior Court (*Houran*, J.) granting reimbursement from the Town and respondent Robert O. Saulnier and injunctive relief to the petitioner, Richard L. Mailloux, for the costs of restoring approximately three acres of his property. We affirm.

The record supports the following facts. This litigation arose out of Saulnier's placement of an illegal junkyard on property now owned by the Town that abuts property owned by Mailloux. In 1988, Mailloux, a commercial developer and contractor, purchased a sixty-three acre parcel of property located on Grenier Field Road in Londonderry. Soon after, he discovered that Saulnier had deposited junkyard materials on his property. Mailloux sent Saulnier a letter demanding that he remove the junk. Saulnier failed to remove any junk, but Mailloux conducted no further inspections of that portion of his property.

In 1991, upon discovering that Saulnier was operating an illegal junkyard, the Town notified him that he was violating local ordinances and instructed him to bring his property into compliance. In 1993, following Saulnier's failure to pay taxes on the property, the Town began action to seize the property by tax deed. The Town initially deferred this action, however, based on Saulnier's numerous representations that his property was severely contaminated. Eventually, however, the Town acquired Saulnier's property (Town parcel) by tax deed in May 1999.

Between April and May 2002, in anticipation of selling some of his lots, Mailloux's representatives began surveying and cutting trees in an area near where his parcel abutted the Town parcel. While doing the site work on Mailloux's property, his representatives discovered that junk vehicles, appliances, metal tanks and other materials had been placed on approximately three acres. Because of the similar condition of the Town parcel, and because of the lack of other access to that section of Mailloux's property, it was apparent that the encroachment came from the Town parcel, where Saulnier still resided.

In May 2002, Mailloux notified the Town of the illegal junkyard's encroachment onto his property. He offered to acquire the Town parcel and to assume the responsibility for evicting Saulnier and hauling away the debris. Negotiations between the Town and Mailloux failed.

The Town issued an order to Saulnier on June 18, 2002, notifying him that he was operating his junkyard in violation of the Town's ordinances and State law and ordering him to remove all debris from the property within thirty days. After preliminary hearings initiated by Mailloux, the Trial Court (*Coffey*, J.) granted Mailloux permission to remove and dispose of all of Saulnier's property located on Mailloux's parcel. The court also

ordered the Town to cooperate with Mailloux in providing traffic, safety and security services during the cleanup of his property.

At a hearing on the merits in July 2003, Mailloux sought relief and reimbursement from the Town and Saulnier for the costs of restoring the approximately three acres upon which Saulnier's materials had been placed. The Trial Court (*Houran*, J.) held both Saulnier and the Town liable for damages under the theory of strict liability.

The Town argues on appeal that the Trial Court erred by: (1) finding that the Town was not a "qualifying holder" and therefore not exempt from liability under RSA chapter 147-B; (2) awarding Mailloux damages of $134,918.35 for the cost of cleaning and removing hazardous waste; (3) ruling that Mailloux's claim was not barred by the doctrine of laches; and (4) ruling that Mailloux's claim was not barred by the doctrine of avoidable consequences. We address each issue in turn.

*I. Qualifying Holder*

The Town's sole defense to the applicability of RSA chapter 147-B is that it is a "qualifying holder." In matters of statutory interpretation:

> We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent.

*Blackthorne Group v. Pines of Newmarket*, 150 N.H. 804, 806 (2004) (citations omitted). We review the trial court's interpretation of a statute *de novo. Hutchins v. Peabody*, 151 N.H. 82, 84 (2004).

RSA 147-B:2, VIII-i (1996 & Supp. 2004) defines a "qualifying holder" as "a holder who does not participate in the management of the [hazardous waste] facility." A "holder" is defined as "a person who holds indicia of ownership primarily to protect a mortgage interest or security interest in real or personal property on or at the facility." RSA 147-B:2, VIII-e (1996 & Supp. 2004). "Indicia of ownership" means "evidence of a mortgage lien, a security interest, or other interests in real or personal property securing payment or performance of a loan or other obligation." RSA 147-B:2, VIII-f (1996 & Supp. 2004). "Primarily to protect a mortgage interest or security interest" means:

> that the holder's indicia of ownership are held primarily for the purpose of securing the payment or performance of the loan or

other obligation. The indicia of ownership held after foreclosure continues to be maintained primarily as protection for a security interest provided that the holder undertakes to sell, re-lease property held pursuant to a lease financing transaction ... or otherwise divest itself of the property in a reasonably expeditious manner, using whatever commercially reasonable means are relevant or appropriate with respect to the facility, taking all facts and circumstances into consideration, and provided that the holder does not participate in management. A holder establishes that it is seeking to sell, re-lease or otherwise divest itself of the property following foreclosure and its equivalents by, within 5 months following foreclosure, listing the facility with a broker, dealer, or agent who deals with the type of property in question, or by advertising the facility as being for sale or disposition on at least a monthly basis in either a real estate publication or a trade or other publication suitable for the facility in question, or a newspaper of general circulation covering the area where the property is located. The holder is entitled to a presumption that it is holding indicia of ownership primarily to protect a mortgage interest or security interest but if the holder does not divest itself of the property within 3 years, the holder bears the burden of showing compliance with this paragraph.

RSA 147-B:2, VIII-h (1996 & Supp. 2004).

The trial court found that the Town failed to meet its burden of showing compliance with RSA 147-B:2, VIII-h, and that it was thus neither a "holder" nor a "qualifying holder" pursuant to RSA chapter 147-B. Accordingly, the trial court found that the Town was not exempt from strict liability under RSA 147-B:10 (1996 & Supp. 2004).

█ The Town acquired the Town parcel through foreclosure in May 1999. Since the Town did not "divest itself of the property within three years," it has the burden of showing that it complied with this paragraph. The Town did not show that it held an "indicia of ownership" to protect its "security interest," because it neither listed the property for sale with a "broker, dealer, or agent" nor "advertis[ed] the facility as being for sale or disposition" within five months following foreclosure; and did not make any effort to divest itself of the property. *See* RSA 147-B:2, VIII-h. Therefore, it did not meet the statutory requirements.

In support of its argument, the Town presents three impediments to the sale of the property: (1) Saulnier's contention that he had polluted the property; (2) massive amounts of junk on the property; and (3) Saulnier's

continued contention that he owned the property. Because the circumstances were "unique," the Town argues that it would have been a "vain and futile thing" for it to attempt to divest itself of the property, because it "could not attempt to market the property to the general public in its then-present condition."

Although we recognize that the condition of the property might have made a sale more difficult, we find the Town's argument to be unpersuasive. At issue is a statutory scheme that deals specifically with hazardous waste facilities. Within that scheme, the legislature clearly delineated how to attempt to divest a property. *See* RSA 147-B:2, VIII-h. Nothing in the scheme mandates a sale of the property; only an attempt to sell is required. The Town could have attempted to sell the property in accordance with the statute, and could have priced it accordingly. Instead, it was not until 2002, when Mailloux contacted the Town to try to negotiate the purchase of the property, that the Town made it known that it was willing to convey the property.

██ We conclude that the trial court did not err in finding that the Town failed to prove that it was a "qualifying holder." Thus, we find that the Town is not exempt from strict liability pursuant to RSA 147-B:10.

## II. Damages

We next address whether Mailloux should have been awarded $134,918.35 in damages for cleaning and removing hazardous waste, of which $68,000.00 was the cost of building a road. We review questions of statutory interpretation *de novo*, in the context of the overall statutory scheme, and not in isolation. *See Blackthorne Group*, 150 N.H. at 806. By so doing, we are better able to discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. *Id.*

The purpose of RSA chapter 147-B is to "provide for the proper, adequate and safe cleanup of sites within New Hampshire where hazardous wastes or materials have been improperly discharged, disposed of or spilled." RSA 147-B:1, II (1996). RSA 147-B:10, II(b) (1996 & Supp. 2004) allows for the recovery of costs for "[n]ecessary cleanup and restoration of the site and the surrounding environment," and RSA 147-B:10, III(b) (1996 & Supp. 2004) allows for the reimbursement of "expenditures which are incurred for the purposes described in paragraph II of [the] section."

It is apparent, then, that the costs of cleanup must be related to the cleanup of hazardous waste as defined in the statute. *See* RSA 147-B:2

(1996 & Supp. 2004). In accordance with this language, we must consider whether the total cost of the cleanup assessed to the Town was related to the necessary cleanup of wastes that were hazardous and the restoration of the site because of the hazardous wastes.

The trial court found that "the material Saulnier placed on both properties contained and were [*sic*] mixed with among other things, gasoline, waste oil, antifreeze, and freon." Consequently, the court found that "the substances and materials located on the [Town parcel] and petitioner's property, including, but not limited to, the junkyard vehicles, appliances, and tanks fall within the definition of 'hazardous waste.'"

Neither party contests the applicability of the hazardous waste statute to this situation. *See* RSA ch. 147-B (1996 & Supp. 2004). Rather, the Town argues that not all of the wastes on the site were hazardous, and therefore the damages award should have been limited to $8,858.98—a figure that reflects the cost of cleanup and removal of the wastes that were specifically deemed hazardous. To support its position, the Town points to the fact that the invoices submitted to the superior court reflect that the hazardous wastes were specifically identified, separated and disposed of.

The statute, in pertinent part, defines hazardous waste as: "[A] solid, semi-solid, liquid or contained gaseous waste, or any combination of these wastes ... [w]hich, because of either quantity, concentration, or physical, chemical, or infectious characteristics may ... [p]ose a present or potential threat to human health or the environment when improperly treated, stored, transported, disposed of or otherwise mismanaged." RSA 147-B:2, VII(a)(2) (1996 & Supp. 2004). Thus, while we agree with the Town that scrap metal and old automobiles, for example, would more likely be categorized as non-hazardous waste or junk, the statute in question allows for site restoration to include hazardous and non-hazardous materials, provided that the removal of the hazardous materials is necessary for the cleanup of the site.

Here, the quantity, combination, storage and mismanagement of materials added difficulty to the junk removers' efforts to separate certain items from others. For example, the junk dealer who was to remove cars could not do so until the supervisor for the construction company involved in the work site came in with excavators to help separate and move items such as oil tanks and oxygen tanks. He testified: "Eventually we had the state come in, DES, and Clean Harbor, so we had to help with them moving things to find out what was under other things."

 Notwithstanding the separate invoices for the disposal of various materials, we believe that the sheer volume of the material—some three

acres worth—and the combination of the materials made all of the site cleanup in this situation necessary to the cleanup of the hazardous wastes. *See* RSA 147-B:2. We therefore uphold the trial court's ruling that the Town's liability extends to the total necessary cost associated with the "cleanup and restoration of the site and the surrounding environment." RSA 147-B:10, II(b); *see also* RSA 147-B:10, III(b).

*III. Laches*

We next consider the Town's argument that the trial court erred in finding that Mailloux's suit was not barred by the doctrine of laches. For the following analysis, we assume without deciding that a laches defense is available in this action. *But cf.* RSA 147-B:10, I (1996 & Supp. 2004) (limiting available defenses in the strict liability action). Laches bars litigation when a potential plaintiff has slept on his or her rights. *Appeal of City of Laconia*, 150 N.H. 91, 93 (2003). Because it is an equitable doctrine, laches will constitute a bar to suit only if the party asserting the defense shows that the delay was both unreasonable and prejudicial. *See Town of Seabrook v. Vachon Management*, 144 N.H. 660, 668 (2000). We consider four factors in our analysis: (1) the knowledge of the plaintiffs; (2) the conduct of the defendants; (3) the interests to be vindicated; and (4) the resulting prejudice. *Appeal of City of Laconia*, 150 N.H. at 93. The trial court has wide latitude in deciding whether the circumstances justify application of the doctrine of laches; unless we find that the trial court's decision is unsupported by the evidence or erroneous as a matter of law, we will not overturn its decision. *In the Matter of State ex rel. Reitenour & Montgomery*, 148 N.H. 358, 362 (2002).

The Town argues that had Mailloux timely advised it of the pertinent facts, it could have declined to accept the tax deed to the Town parcel. The Town also argues that Mailloux could have complained to the Town in 1988, and thereby alerted the Town to Saulnier's trespass, which would have allowed the Town "to stop the problem at an early stage."

The trial court found that prior to taking the tax deed, the Town was informed by Saulnier of severe contamination, and also found that the Town: (1) was aware of Saulnier's illegal junkyard operation since at least 1991; (2) made no apparent attempt to investigate the extent of the illegal operations—which presumably would have led to the discovery of Saulnier's encroachment; and (3) allowed Saulnier to stay on the property and continue to operate the illegal facility, even after taking ownership in 1999. The court reasoned that although Mailloux admitted that he knew of a minor encroachment on his property in 1988, he "credibly testified" that he sent Saulnier a letter asking him to rectify the slight encroachment, and

that he had no reason to believe Saulnier failed to comply with his request. The court stated that Mailloux "had no reason to inspect that area of the property over the next few years given the contour and layout of the site and the lack of any concrete development opportunities." The trial court found, therefore, that "[t]he facts and circumstances of this case establish that any delay here was not unreasonable as a matter of law."

■ Even assuming, however, that Mailloux unreasonably delayed bringing the liability proceeding, we are not persuaded that the Town was materially prejudiced by this delay. *See Appeal of City of Laconia*, 150 N.H. at 93. The Town argues that Mailloux's delay resulted in "significant prejudice" to the Town, "causing it to face unnecessary litigation and expense." The trial court found, however, "nothing that would render [Mailloux's] delay in seeking relief prejudicial to the Town." In fact, the court found no evidence that the relief sought would constitute surprise leading to special harm; rather, it found that the Town had been to the property and knew of the illegal activities. Accordingly, the trial court ruled that there was insufficient evidence to support a finding of laches.

The record clearly establishes that the Town took on its difficulties knowingly; since at least 1991, the Town knew of Saulnier's illegal junkyard, and since approximately 1993, it knew of probable contamination of the property. We cannot conclude, therefore, that the trial court's decision is unsupported by the evidence or that the court erred in determining that Mailloux's claim for reimbursement of cleanup costs was not barred by the defense of laches. *See Montgomery*, 148 N.H. at 362.

*IV. Avoidable Consequences*

■ Finally, we address the Town's argument that the doctrine of avoidable consequences should bar Mailloux's claim. As with our laches analysis, we assume without deciding that the doctrine is available in this action. The doctrine, which is available in property torts, requires a plaintiff to take all reasonable steps to mitigate damages after he or she has been tortiously injured. *See Smith v. Cote*, 128 N.H. 231, 243 (1986). It is a specific type of mitigation which states "that a party cannot recover damages flowing from consequences which that party could reasonably have avoided." *Anglin v. Kleeman*, 140 N.H. 257, 263 (1995) (quotation omitted). A trial court's finding on this issue cannot be overturned unless it totally lacked evidentiary support or was tainted by error of law. *See Montgomery*, 148 N.H. at 362.

The Town first argues that this doctrine should bar Mailloux's claim because Mailloux's awareness since 1988 of Saulnier's trespassory acts

prevents him from recovering any damages resulting from those acts. The trial court ruled on this doctrine by stating: "For the same reasons set forth above under the Court's discussion of laches, the Court finds and rules that petitioner . . . [did not fail] to mitigate his damages contrary to the 'avoidable consequences' rule."

We defer to the trial court's judgment of the persuasiveness of the evidence and the credibility of the witnesses. *See Fisher v. Koper*, 127 N.H. 330, 335 (1985). In addition to hearing testimony, the court saw exhibits including letters, deeds, reports, numerous photographs of the site and junkyard and a plan of the lands showing Grenier Field Road. We are, therefore, persuaded by the court's finding that Mailloux "credibly testified" as to his reason for failing to rectify the encroachment.

The Town's second argument pursuant to the avoidable consequences doctrine is that Mailloux is not entitled to road construction costs that were "completely unreasonable and unnecessary," where he could have used the Town's property for access. The trial court did not make any express finding with respect to the costs of building the road. We assume, however, that the court found that constructing the road was necessary for the site cleanup, because such an implied finding is necessary to support the court's damage award. *See Chagnon Lumber Co., Inc. v. DeMulder*, 121 N.H. 173, 176 (1981).

The Town argues that "if Mr. Saulnier could bring the materials over to the plaintiff's property from 22 Grenier Field Road, then those materials could be moved back across that access to remove them from the premises." The Town notes that Mailloux never asked for its help in providing access to and removing garbage from its property, and contends that Mailloux "needed to remove the materials in large volume with trucks" due to "claimed time constraints."

The record supports, however, the reasonableness and necessity of Mailloux's road construction. Specifically, the site supervisor testified that before his company built the road, there was access to the property only through a farmer's trail. He also testified that "getting to everything" was a problem because of too much garbage, and that in order to get to the materials, they had to build the road, even though they had originally wanted to come through the Town's property. He also testified that the junk car dealer who was contracted to remove as many cars as he could was not able to get in through the Town's property as originally planned, because it was "too tight of a squeeze." Especially illuminating as to the necessity of the road was Mailloux's testimony when asked whether he was planning to build the road anyway. Mailloux replied: "No. In fact it has to

be removed ... next week, it'll be closed off and will no longer be the access."

After review of the record, we cannot conclude that the trial court's decision is unsupported by the evidence or that the court erred in determining that Mailloux's claim for reimbursement of cleanup costs was not barred by the doctrine of avoidable consequences. *See Montgomery,* 148 N.H. at 362.

*Affirmed.*

BRODERICK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.