## JASON RICH ET AL. *v.* GERARD J. FOYE, JR., ET AL.

Superior Court, Complex Litigation Docket, Judicial District of Waterbury
File No. X01-UWY-CV-06-5003443-S

---

Memorandum filed August 28, 2007

*Silver, Golub & Teitell*, for the plaintiffs.

*Sachner & O'Connor, LLC*, for the defendants.

CREMINS, J.

## I

## BACKSTORY

The plaintiffs, Jason Rich and Keri Rich, individually, and Jason Rich and Keri Rich as parents and next friends of Sydney Rich, a minor, make the following allegations in a three count complaint filed on July 14, 2006. In December, 2002, Jason Rich and Keri Rich engaged the defendants, Gerard J. Foye, Jr., a physician who is board certified in obstetrics, gynecology and maternal fetal medicine; Candlewood Obstetric-Gynecologic Associates, P.C.; Women's Health USA, Inc.; and

Women's Health Connecticut, Inc., to deliver prenatal, obstetrical and postpartum care to Keri Rich during her third pregnancy.

In March, 2003, Keri Rich underwent blood tests to screen for Down's syndrome, trisomy 18 and open neural tube defects. These test results showed the risk of trisomy 18 to be 1:199. On April 9, 2003, Keri Rich underwent a fetal ultrasound study at the defendants' offices. The ultrasound was performed by a sonographer, a nonparty to this action. Foye also performed the ultrasound study. The fetal ultrasound was interpreted by the sonographer, and Foye also reviewed the sonographer's images and findings and reported the study's outcome in his records. The fetal ultrasound study revealed a significant abnormality involving the malformation of the cerebellum and an associated cyst, an abnormality referred to as Dandy-Walker syndrome. The plaintiffs alleged that "Dandy-Walker syndrome is known to cause severe functional and cognitive disabilities, and is often associated with other major central nervous system abnormalities, such as agenesis of the corpus callosum, as well as chromosomal and genetic defects, such as [t]risomy 18." The sonographer who performed the ultrasound reported that there were no abnormalities and that the cerebellum was normal. Foye reported that no abnormalities were found during the fetal ultrasound study and stated that the cerebellum shape was normal. Foye concluded that the ultrasound was normal. The defendants reported to Keri Rich that no abnormalities were seen and that the ultrasound was normal.

The defendants continued to care for Keri Rich throughout her pregnancy, and on August 4, 2003, Sydney Rich was born. After Sydney Rich's birth, it was determined that she suffered from Dandy-Walker malformation, dysgenesis of the brain stem and cerebellum, total agenesis of the corpus callosum and microcephaly. Because of these abnormalities, the plaintiffs alleged,

"Sydney Rich suffers from permanent and debilitating neurologic, mental and physical handicaps including seizure disorder, cognitive loss, vision loss, and motor deficits, all requiring extraordinary care."

## II

## JOURNEY OF THE PLEADINGS

On July 14, 2006, the plaintiffs filed a three count complaint against the defendants. In count one of the complaint, which alleges wrongful birth, Jason Rich and Keri Rich, individually, allege negligence in the defendants' failure to properly interpret Keri Rich's April 9, 2003 fetal ultrasound study; failure to inform Keri Rich of the results and significance of the prenatal testing; failure to inform Keri Rich properly of the condition of the fetus; failure to inform Keri Rich of the risk that her child would be born with abnormalities; and failure to advise Keri Rich and, or, offer her further prenatal testing, counseling, advice and treatment, such as termination of the pregnancy. Jason Rich and Keri Rich further allege that as a result of the defendants' negligence, Keri Rich gave birth to Sydney Rich, causing Jason Rich and Keri Rich to incur the extraordinary expense of the required care for Sydney Rich for the rest of her life, and Jason Rich and Keri Rich to suffer extreme emotional distress and impairment of their ability to enjoy life's activities.

In count two of the complaint, alleging lack of informed consent, Jason Rich and Keri Rich, individually, allege that as a result of the defendants' negligence, Jason Rich and Keri Rich were deprived of the opportunity to make an informed choice concerning the continued care and treatment of Keri Rich's pregnancy, thus precluding Jason Rich and Keri Rich from choosing to terminate the pregnancy.

In count three of the complaint, alleging wrongful life, Sydney Rich, through Keri Rich and Jason Rich,

alleges that but for the defendants' negligence, she would not have been born. Sydney Rich further alleges that as a result of the defendants' negligence, she has experienced and will continue to experience physical and mental pain and anguish, she will be unable to lead a normal life, and she will require special care and supervision for the rest of her life. In addition, Sydney Rich alleges that her ability to enjoy life's activities has been severely curtailed and impaired, and her earning capacity has been permanently destroyed.

On March 7, 2007, the defendants filed a motion to strike the second and third counts of the complaint in their entirety and paragraph twenty-six of the first and second counts of the complaint. The defendants move to strike paragraph twenty-six of the first and second counts on the ground that Connecticut does not recognize a separate cause of action for bystander emotional distress in medical malpractice cases. Other grounds raised by the defendants for striking paragraph twenty-six in counts one and two are that (1) an allegation of negligent infliction of emotional distress, as pleaded, is legally insufficient and (2) Jason Rich lacks any physician-patient relationship with any of the defendants, which would allow him to allege emotional distress. The defendants further move to strike count two on the ground that it represents a cause of action entirely repetitive of the wrongful birth claim contained in the first count. The defendants also move to strike count two on the ground that it fails to allege the requisite elements to support a cause of action sounding in lack of informed consent. The defendants move to strike count three on the ground that Connecticut does not recognize a cause of action of wrongful life.

### III

### LEGAL STANDARD

A motion to strike challenges "the legal sufficiency of the allegations of any complaint . . . ." Practice

Book § 10-39 (a). "The proper method to challenge the legal sufficiency of a complaint is to make a motion to strike prior to trial." *Gulack* v. *Gulack*, 30 Conn. App. 305, 309, 620 A.2d 181 (1993). "Practice Book [§ 10-39] allows for a claim for relief to be stricken only if the relief sought could not be legally awarded." *Pamela B.* v. *Ment*, 244 Conn. 296, 325, 709 A.2d 1089 (1998).

"The ground for the [motion to strike] may be that the facts, as pleaded, do not constitute a legally recognizable claim for relief . . . ." *Nowak* v. *Nowak*, 175 Conn. 112, 116, 394 A.2d 716 (1978). "[I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 294, 914 A.2d 996 (2007).

With regard to count one, paragraph twenty-six of this complaint and count three of this complaint, "A motion to strike is the proper procedural vehicle . . . to test whether Connecticut is ready to recognize some newly emerging ground of liability." (Internal quotation marks omitted.) *Blue* v. *Renassance Alliance, LLC*, Superior Court, judicial district of New Haven at Meriden, Docket No. CV-05-4001949-S (May 12, 2006) (*Shluger, J.*).

IV

DISCUSSION

A

Emotional Distress (Noneconomic) Damages—Count One,[1] Paragraph Twenty-Six

The defendants argue that there is no legal ground to support Jason Rich's and Keri Rich's recovery of

---

[1] At this time, this court will examine only whether paragraph twenty-six of count one of the complaint should be stricken because if the court determines that count two of the complaint alleging lack of informed consent should be stricken in its entirety, then paragraph twenty-six of count two will then be stricken as well.

damages for emotional distress because (1) Connecticut law generally prohibits a plaintiff from recovering for emotional distress in the absence of physical injury or a risk of harm from physical impact; (2) Connecticut does not recognize a claim for loss of consortium outside of the spousal context; (3) bystander emotional distress is inapplicable to Jason Rich's and Keri Rich's claims; (4) Jason Rich and Keri Rich may not recover for negligent infliction of emotional distress, as they cannot meet their burden of pleading and establishing that the defendants should have realized that their conduct involved an unreasonable risk of causing emotional distress and that the distress, if caused, might result in illness or bodily harm; (5) a wrongful birth claim does not fall within an exception to the rule prohibiting damages for emotional distress absent physical injury or risk of harm from physical impact; and (6) the defendants owed no duty of care to Jason Rich.

As indicated previously, Jason Rich and Keri Rich seek damages for the extraordinary expenses connected with their daughter's condition as well as damages for their own emotional distress and impairment of their ability to enjoy life. They do not allege that the defendants' negligence caused physical injury to either of them. There is no separate count claiming damages for "bystander emotional distress" or "loss of consortium." Likewise there is no separate count sounding in "negligent infliction of emotional distress."

No appellate court in this state has explicitly held that parents who suffer no physical injury are entitled to damages for emotional distress in what is known as a "wrongful birth" case. The defendants contend that such damages should not be permitted in Connecticut. The defendants further argue that Jason Rich and Keri Rich in this medical malpractice case cannot recover for noneconomic emotional distress damages in addition to economic damages.

Connecticut recognizes a cause of action for wrongful birth. However, in the two Connecticut Supreme Court cases involving wrongful birth, the court did not address the issue of noneconomic damages in cases in which the plaintiff parents did not allege physical injury to themselves. *Ochs* v. *Borrelli*, 187 Conn. 253, 445 A.2d 883 (1982), involved a negligent sterilization procedure. The defendants, a physician and his professional corporation, appealed, inter alia, from the judgment on the verdict awarding damages to the plaintiffs, the parents of a child born followed by an unsuccessful sterilization procedure performed on the plaintiff mother. These damages included the ordinary costs of raising a child until maturity as well as medical expenses associated with the child's orthopedic problems.[2] The defendants argued that ordinary costs of raising a child should not be allowed because the benefit that the child brings totally offsets those costs. The court stated: "In our view, the better rule is to allow parents to recover for the expenses of rearing an unplanned child to majority when the child's birth results from negligent medical care. The defendants ask us to carve out an exception, grounded in public policy, to the normal duty of a tortfeasor to assume liability for all the damages that he has proximately caused. . . . But public policy cannot support an exception to tort liability when the impact of such an exception would impair the exercise of a constitutionally protected right." (Citations omitted.) Id., 258.

In *Burns* v. *Hanson*, 249 Conn. 809, 734 A.2d 964 (1999), the plaintiff, the mother of one child, had multiple sclerosis (MS) and was advised that any future pregnancy could be detrimental to her. According to the plaintiff, upon being told by her gynecologist, a named

---

[2] The defendants conceded responsibility to compensate the plaintiffs for their child's orthopedic expenses.

defendant in the action,[3] that she was sterile as a result of treatments for the MS,[4] she and her husband discontinued using birth control. The plaintiff became pregnant. The defendant then failed to diagnose the plaintiff's pregnancy when he examined her. The plaintiff's pregnancy was not confirmed until she was twenty to twenty-one weeks pregnant. The plaintiff gave birth to a healthy child. In addition to seeking damages for the costs in caring for her child, the plaintiff sought damages for, inter alia, her own physical injury, which included an exacerbation of the MS, and damages for pain and emotional distress.

Prior to trial, the trial court struck the count of the complaint relating to the alleged liability of the defendant for the costs associated in rearing a healthy child. The jury returned a verdict in favor of the defendant, and, on appeal, the plaintiff argued, inter alia, that the trial court, in its pretrial ruling, improperly excluded a claim for recovery of the costs relating to raising a health child. In response to the defendant's argument on appeal that an award of the costs for raising a child was improper when the desire to not have another child was based on reasons other than economic ones, the Supreme Court stated: "In our view, the defendant's argument is fundamentally inconsistent with our reasoning in *Ochs*. We declined to carve out any exception, grounded in public policy, to the normal duty of a tortfeasor to assume liability for all the damages that he or she has caused. We held that any such exception would improperly burden the exercise of a constitutionally protected right to employ contraceptive measures to limit the size of one's family. . . . That constitutional right is similarly a part of the background in the

---

[3] A corporation, of which the defendant gynecologist was an agent and employee, was also a defendant in this case. For convenience, the Supreme Court referred only to the individual defendant. In this memorandum of decision, this court will do the same.

[4] According to the defendant, sterility was never discussed.

present case. Moreover, unlike the cases upon which the defendant relies, the risk that the plaintiff sought to avoid in fact did come to pass in the present case. We are, therefore, not persuaded at this juncture to follow what may be contrary precedents in other state courts." (Citation omitted.) Id., 819–20.

As part of their wrongful birth and informed consent counts, Jason Rich and Keri Rich seek compensation for the extreme emotional distress they have allegedly suffered as a result of the defendants' alleged negligence. The defendants challenge Jason Rich's and Keri Rich's right to recover damages for emotional distress, arguing that Connecticut law generally does not allow damages for emotional distress caused by witnessing injury to another person. One way that the defendants characterize Jason Rich's and Keri Rich's claim for emotional distress damages is as a claim for bystander emotional distress, and the defendants argue that Jason Rich and Keri Rich have failed sufficiently to allege a cause of action that is based on bystander emotional distress. Another way that the defendants characterize Jason Rich's and Keri Rich's claim for emotional distress damages is as a claim for negligent infliction of emotional distress, and the defendants assert that Jason Rich and Keri Rich fail to allege a cause of action that is based on negligent infliction of emotional distress. The defendants further maintain that Jason Rich is not entitled to damages for emotional distress, as they owed no duty to him.

Jason Rich and Keri Rich respond that they are not seeking to recover damages for bystander emotional distress. As was held in *Chamberland* v. *Physicians for Women's Health, LLC*, Superior Court, judicial district of Waterbury, Docket No. CV-01-0164040-S (February 8, 2006) (*Gallagher, J.*) (40 Conn. L. Rptr. 731), in a wrongful birth action, the parents' claim for emotional distress is not a claim for "bystander" injuries suffered

as a result of witnessing negligent injury inflicted on their child. Rather, it is a claim that the parents have suffered emotional damages caused as result of a breach by the defendant, a physicians group, of a duty owed to directly to them. For purposes of claims for economic damages, the Connecticut Supreme Court has recognized that parents are not "bystanders" in a wrongful birth action but are directly injured as a result of the defendant's negligence.

In *Ochs*, the Supreme Court found that the plaintiffs had suffered a legally cognizable injury when a defendant physician negligently performed a sterilization procedure, thus leaving the mother fertile and resulting in the subsequent birth of the child. Similarly, in *Burns*, the Supreme Court held that when a plaintiff alleges that her gynecologist negligently informed her that she was sterile and failed to timely diagnose a pregnancy, the plaintiff was entitled to present to the jury her claim for costs of raising a healthy child. Thus, in *Burns*, the plaintiff has allegedly suffered a direct injury.

In *Anonymous* v. *Hospital*, 33 Conn. Sup. 125, 366 A.2d 204 (1976), the plaintiffs, a husband and wife, brought a malpractice action against a hospital and physician for negligently performing a bilateral tubal ligation, thus leaving the plaintiff wife fertile. The plaintiff wife became pregnant and subsequently gave birth to a child. In paragraph eight of count one of that complaint, it was alleged that the plaintiff wife " 'suffered the pain and trauma of the birth of a child, consequent damage to herself, pain and anxiety and nervousness over her pregnancy and childbirth. She became nervous and upset upon learning that she was pregnant.' " Id. Paragraph nine of count one of that complaint alleged " 'great emotional stress and strain. The plaintiff and her husband have had to replan their family life. In addition the plaintiff and her husband have incurred and will incur unexpected and unplanned for hospital

and medical and surgical bills and unplanned for and unexpected costs and expenses in raising and bringing up their fourth child, all of which, because of the financial condition of the plaintiff and her husband, will impose a great burden on them . . . .' " Id., 126. In paragraph eleven of count two of that complaint, the plaintiff husband reiterated the same elements of damage that his wife alleged in paragraphs eight and nine of count one. Id.

The defendants demurred, inter alia, to allegations purporting to allege a cause of action for the cost to the plaintiffs of raising their fourth child, and a cause of action for emotional stress and strain connected with having that child. The Superior Court in *Anonymous* cited *Custodio* v. *Bauer*, 251 Cal. App. 2d 303, 322, 59 Cal. Rptr. 463 (1967), and stated: "In *Custodio* v. *Bauer*, supra, the California Court of Appeals in the first district, in overruling the sustaining of general demurrers to the complaint, held (p. 322) that if a plaintiff and her husband were able to establish violation of the duty owed by the defendant physicians in performing a sterilization operation on the wife, they should at least be reimbursed for any outlay for the unsuccessful operation, and they should recover for any physical complications and mental, physical, and nervous pain and suffering which the operation was designed to prevent." *Anonymous* v. *Hospital*, supra, 33 Conn. Sup. 127. The court in *Anonymous* denied the defendants' demurrer and stated that "[t]he safer course in situations similar to the present case would appear to be to allow the allegations of the complaint to stand and to permit the defendants to argue in mitigation of damages the satisfaction, joy, and companionship which normal parents receive in the rearing of a child and which make economic loss worthwhile. Although the specific ascertainment of damages in that area is difficult, that should

not prevent their consideration by the trier of fact." Id., 128–29.

Again, in *Chamberland*, the Superior Court addressed the issue of damages for emotional distress and held that a plaintiff parent is entitled to recover damages for emotional distress as part of a wrongful birth action. The court reasoned that *Ochs* and *Burns* both recognize that the parents are not bystanders but are directly injured as a result of the defendants' negligence in a wrongful birth action. The court in *Chamberland* found that Connecticut law regarding wrongful birth cases is similar to that of other jurisdictions that permit noneconomic damages, including emotional distress suffered by the parents. The court specifically relied on and adopted the reasoning of the Florida and Virginia Supreme Courts (*Kush* v. *Lloyd*, 616 So. 2d 415 [Fla. 1992], and *Naccash* v. *Burger*, 223 Va. 406, 290 S.E.2d 825 [1982]), and specifically declined to follow the reasoning of the New Hampshire Supreme Court in *Smith* v. *Cote*, 128 N.H. 231, 513 A.2d 341 (1986), a case relied on by the defendants in the present case.

In *Kush*, the Florida Supreme Court recognized an exception, in the case of wrongful birth actions, to the general rule precluding emotional distress damages without physical "impact." The court explained that "Prosser and Keeton state that the impact doctrine should not be applied where emotional damages are an additional 'parasitic' consequence of conduct that itself is a freestanding tort apart from any emotional injury. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 54, at 361–65 (5th ed. 1984). The American Law Institute is in general accord. Restatement (Second) of Torts § 47 & § 47 cmt. b (1965)." *Kush* v. *Lloyd*, supra, 616 So. 2d 422.

The court further explained: "Similarly, the impact doctrine also generally is inapplicable to recognized

torts in which damages often are predominately emotional, such as defamation or invasion of privacy. Restatement (Second) of Torts §§ 569, 570, 652H cmt. b (1977). . . . For example, it is well settled that mental suffering constitutes recoverable damages in cases of negligent defamation . . . . Accord [id.] §§ 569, 570, 652H, [comment (b)]. If emotional damages are ascertainable in these contexts, then they also are ascertainable here." (Citations omitted.) *Kush* v. *Lloyd*, supra, 616 So. 2d 422.

The court in *Kush* held that "these parents went to considerable lengths to avoid the precise injury they now have suffered. We conclude that public policy requires that the impact doctrine not be applied within the context of wrongful birth claims." Id., 423.

In *Naccash*, the Virginia Supreme Court also held that the circumstances of a wrongful birth case justify a claim for emotional injury, even though such injuries did not arise, as had been the rule in Virginia, from "physical injury." The court reasoned: "The restrictions upon recovery [for emotional distress] were designed to discourage spurious claims asserted by chance witnesses to physical torts involving others. The considerations prompting imposition of the limitations do not exist here; no one suggests that the [plaintiff parents'] emotional distress was feigned or that their claim was fraudulent. Indeed, to apply the restrictions here, or to refuse to recognize an exception to the general rule, would constitute a perversion of fundamental principles of justice." (Internal quotation marks omitted.) *Naccash* v. *Burger*, supra, 223 Va. 416. The court also reasoned that the plaintiff parents were not bystanders but were directly injured by the defendant physician's negligence. The court stated: "[I]t would be wholly unrealistic to say that the [plaintiff parents] were mere witnesses to the consequences of the tortious conduct involved in this case. . . . [T]he evidence shows an

unbroken chain of causal connection directly linking the erroneous [genetic blood test] report, the deprivation of the parents' opportunity to accept or reject the continuance of [the plaintiff mother's] pregnancy, and the emotional distress the parents suffered following the birth of their fatally defective child." Id.

In *Chamberland*, the Superior Court, in determining that the plaintiff parents were entitled to recover damages for emotional distress, explained: "[T]he risk that the plaintiff[s] sought to avoid [giving birth to a child with spina bifida] in fact did come to pass in the present case." (Internal quotation marks omitted.) *Chamberland* v. *Physicians for Women's Health, LLC*, supra, 40 Conn. L. Rptr. 735, quoting *Burns* v. *Hanson*, supra, 249 Conn. 820. The court in *Chamberland* further reasoned that it was "hard-pressed to find any legitimate concern, in cases such as this one, that the plaintiff could be feigning emotional distress without the accompanying bodily injury or impact." *Chamberland* v. *Physicians for Women's Health, LLC*, supra, 735.

In *Chamberland*, the court also explicitly held that the plaintiff father has the same right to recover for emotional distress damages as the plaintiff mother, rejecting the defendant's argument that it owed no duty to the plaintiff father. The court in *Chamberland* reasoned that in *Ochs*, the Supreme Court recognized a duty to both parents not to interfere with their right and opportunity to make a decision concerning the employment of contraceptive methods to limit the size of their families. The court in *Chamberland* further reasoned that the majority of cases from other jurisdictions "make no distinction between the duty owed to the mother and the father." Id., 736. Therefore, the court in *Chamberland* found "that there is no support for the defendant's contention that it owed no duty to the father." Id.

In contrast, the New Hampshire Supreme Court reasoned in *Smith* v. *Cote*, supra, 128 N.H. 247, that it would be illogical to allow damages for the parents' emotional distress in a wrongful birth case when parents are not allowed to recover for emotional distress in a wrongful death action where the child's death is actually caused by the negligence of the physician.

Contrary to the *Smith* court's assertion, however, there is a logical distinction between these two situations. A wrongful birth case involves emotional distress arising out of a recognized duty to the parents directly, while a wrongful death case involves a duty owed to the child. Connecticut law, however, recognizes that in a wrongful birth case, the parents themselves have suffered a direct injury, by being deprived of the opportunity to choose to terminate the pregnancy. Allowing the parents to recover for their emotional distress directly resulting from the defendants' breach of a duty owed to them is consistent with "the normal duty of a tortfeasor to assume liability for *all* the damages that he or she has caused." (Emphasis added.) *Burns* v. *Hanson*, supra, 249 Conn. 819.

Jason Rich and Keri Rich are not bystanders and thus are entitled to seek damages for emotional distress that is found to be a direct and proximate result of the defendants' negligence. Jason Rich and Keri Rich allege that the defendants failed to conform to the standard of care; that as a result, they were deprived of the opportunity to make an informed decision regarding termination of Keri Rich's pregnancy; that but for the defendants' negligence, they would have terminated Keri Rich's pregnancy; and as a result of the defendants' negligence, Jason Rich and Keri Rich have suffered emotional distress.

"[Emotional distress] is a proper element of damages only when it results from the breach of a duty to the

particular plaintiff." *Lessard* v. *Tarca*, 20 Conn. Sup. 295, 298, 133 A.2d 625 (1957). "Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action. . . . Thus, [t]here can be no actionable negligence . . . unless there exists a cognizable duty of care. . . . [T]he test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. . . .

"With respect to the second inquiry, namely, the policy analysis, there generally is no duty that obligates one party to aid or to protect another party. See 2 Restatement (Second), Torts § 314, p. 116 (1965). One exception to this general rule arises when a definite relationship between the parties is of such a character that public policy justifies the imposition of a duty to aid or to protect another. See W. Prosser & W. Keeton, [supra] § 56, pp. 373–74; see also 2 Restatement (Second), supra, §§ 314A, 315 . . . ." (Internal quotation marks omitted.) *Murdock* v. *Croughwell*, 268 Conn. 559, 566, 848 A.2d 363 (2004).

As courts in other jurisdictions have pointed out, the wrong here is not the birth of the child but the *deprivation of the plaintiffs' right to make a decision* concerning whether to continue the pregnancy with the knowledge that it will result in the birth of a child with significant abnormalities or to have an abortion. The right to choose an abortion is one that is constitutionally protected. The Connecticut Supreme Court has expressly found a duty to both parents in circumstances

similar to those in this case: "It is now clearly established that parents have a constitutionally protected interest located 'within the zone of privacy created by several fundamental constitutional guarantees;' *Griswold* v. *Connecticut*, 381 U.S. 479, 485, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965); *Roe* v. *Wade*, 410 U.S. 113, 153, 93 S. Ct. 705, 35 L. Ed. 2d 147, reh. denied, 410 U.S. 959, 93 S. Ct. 1409, 35 L. Ed. 2d 694 (1973); to employ contraceptive techniques to limit the size of their family." *Ochs* v. *Borrelli*, supra, 187 Conn. 258. Although *Ochs* involved a failed sterilization procedure, the court cannot find any reason based on public policy to distinguish the duty owed to the plaintiff father in that case from the duty owed to the plaintiff father in this one. The same constitutionally protected rights are involved. The court also notes that the Superior Court in *Chamberland* held that the defendant did owe a duty of care to the plaintiff father. The court therefore rejects the defendants' contention that they owed no duty to Jason Rich.

In *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978), the Supreme Court held that "recovery for unintentionally-caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact." The *Montinieri* court found that the trial court in that case did not err when it charged the jury that to award emotional damages to the plaintiffs, "the defendant . . . should have realized that its conduct involved an unreasonable risk of causing the distress, and from the facts known to it, should have realized that the distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) Id., 341. Additionally, the plaintiff's fear must be reasonable in light of the defendant's conduct. *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 261–62, 654 A.2d 748 (1995). In *Chamberland* v. *Physicians for*

*Women's Health, LLC,* supra, 40 Conn. L. Rptr. 734–35, the court applied the *Montinieri* test as it pertains to negligent infliction of emotional distress to a claim of wrongful birth, and it found that the emotional distress experienced by the plaintiff parents was "clearly foreseeable." Id., 735.

In the present case, it is alleged that the defendants were negligent in that they failed to discover certain fetal abnormalities in an ultrasound test, thereby depriving Jason Rich and Keri Rich of the choice to determine if the pregnancy should be terminated because of the deformities. In this situation, it is "clearly foreseeable" that emotional distress might result from bearing and raising a child with abnormalities. Furthermore, as per *Barrett,* the emotional distress allegedly experienced by Jason Rich and Keri Rich is reasonable in light of the defendants' alleged conduct.

In conclusion, damages for emotional distress should be recognized as a legally cognizable claim in wrongful birth actions. In addition, this court determines that the defendants owed a duty to Jason Rich as well as to Keri Rich. Accordingly, the defendants' motion to strike paragraph twenty-six of the first count of the complaint is denied.

B

Informed Consent—Count Two

In this case, a count sounding in lack of informed consent cannot be supported. The facts of the case do not substantiate an allegation of lack of informed consent.

"The informed consent doctrine derives from the principle that [e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an

assault, for which he is liable in damages." (Internal quotation marks omitted.) *Duffy* v. *Flagg*, 279 Conn. 682, 691, 905 A.2d 15 (2006). "Traditionally, a physician's duty to disclose information was measured by a professional standard which was set by the medical profession in terms of customary medical practice in the community. . . . [However, in] *Logan* v. *Greenwich Hospital Assn.*, [191 Conn. 282, 292–93, 465 A.2d 294 (1983)], [Connecticut] adopted a lay standard and stated that under the doctrine of informed consent, a physician is obligated to provide the patient with that information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy. . . . [These] four elements . . . must be addressed in the physician's disclosure to the patient in order to obtain valid informed consent. [I]nformed consent involves four specific factors: (1) the nature of the procedure; (2) the risks and hazards of the procedure; (3) the alternatives to the procedure; and (4) the anticipated benefits of the procedure." (Internal quotation marks omitted.) *Hayes* v. *Camel*, 283 Conn. 475, 476–77 n.3, 927 A.2d 880 (2007). "Thus, [u]nlike the traditional action of negligence, a claim for lack of informed consent focuses not on the level of skill exercised in the performance of the procedure itself but on the adequacy of the explanation given by the physician in obtaining the patient's consent." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 180, 896 A.2d 777 (2006).

Our Supreme Court has stated: "All of the informed consent cases in Connecticut have involved the adequacy of information disclosed regarding the procedure and treatment to be performed. See, e.g., *Fabrizio* v. *Glaser*, 237 Conn. 25, 26, 675 A.2d 844 (1996) (alleging lack of informed consent for extraction of wisdom teeth); *Pedersen* v. *Vahidy*, 209 Conn. 510, 512, 552 A.2d

419 (1989) (alleging lack of informed consent for failure to disclose risks associated with lipoma removal); *Shelnitz* v. *Greenberg*, 200 Conn. 58, 60, 509 A.2d 1023 (1986) (alleging lack of informed consent for failure to disclose spinal headache as risk of myelogram procedure); *Logan* v. *Greenwich Hospital Assn.*, [supra, 191 Conn. 284] (alleging lack of informed consent for failure to disclose alternatives to percutaneous renal biopsy)." *Alswanger* v. *Smego*, 257 Conn. 58, 67, 776 A.2d 444 (2003). "Thus, Connecticut cases in this area uniformly involve claims for lack of informed consent rising from risks associated with the treatment or procedure itself, *not* from risks associated with failure to properly diagnose or to provide treatment or testing." (Emphasis added.) *Glover* v. *Griffin Health Services*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X06-CV-05-5001692-S (June 21, 2006) (*Stevens, J.*) (41 Conn. L. Rptr. 527, 529).

Furthermore, the Appellate Court has stated: "Typically, the basis for claiming a lack of informed consent is a failure to make a sufficient disclosure of the risks of or alternatives to a certain medical procedure or treatment." *Caron* v. *Adams*, 33 Conn. App. 673, 687, 638 A.2d 1073 (1994).

In *Glover*, the plaintiff alleged the following facts in her complaint. The plaintiff, who was complaining of a headache, sought treatment at the emergency room of Griffin Health Services Corporation (Griffin Hospital), one of the defendants. At Griffin Hospital, the plaintiff was seen by Christopher Michos, a medical doctor and a defendant. Michos ordered a lumbar puncture and a computerized tomography (CT) scan of the plaintiff's head. The plaintiff underwent both procedures, and Ramin Ahmadi, a medical doctor and a defendant, was sent copies of both reports. Although the scan did not indicate an acute abnormality, the lumbar puncture "demonstrated an elevated opening pressure of 49 cm/

water with a closing pressure of 39 cm/water." (Internal quotation marks omitted.) *Glover* v. *Griffin Health Services*, supra, 41 Conn. L. Rptr. 528. Later that day, the plaintiff received a diagnosis of headache from Michos, was prescribed Percocet and was discharged from the hospital.

After the plaintiff's visit to the emergency room, she sought care at her primary care facility, Hill Health Corporation (Hill Health), a defendant. At Hill Health, she was seen by Seema D'Souza, a medical doctor and a defendant. D'Souza recommended a neurological consult and a magnetic resonance image (MRI), and the plaintiff underwent an MRI. A copy of the results was sent to Ahmadi. "[A] partially empty sella and a posterior fossa cisterna matter or arachnoid cyst"; (internal quotation marks omitted) id.; were reported by the physician who performed the MRI. Later, James Butler, a medical doctor and a defendant, consulted with the plaintiff at Griffin Hospital. Butler reviewed the MRI report and "prescribed a trial of Neurontin for a right facial spasm." (Internal quotation marks omitted.) Id.

The plaintiff later sought treatment again at Hill Health for headaches and other symptoms and was seen by D'Souza. The plaintiff received a diagnosis of migraines from D'Souza and a prescription for Imitrex. The plaintiff was told to return one month later. Shortly thereafter, the plaintiff returned to Griffin Hospital to seek treatment for her headaches, and the physician's assistant who saw her prescribed Cafergot and discharged her. The plaintiff returned to Griffin Hospital to seek treatment for headaches and was seen by Sybil Cheng, an osteopathic physician and a defendant. Cheng diagnosed the plaintiff with "opthalmoplegic migraines"; (internal quotation marks omitted) id.; and requested a neurological consult with Butler. Butler diagnosed the plaintiff with the same malady as Cheng had and recommended a follow-up. The plaintiff later

returned to Griffin Hospital for headaches and some-time thereafter went blind.

The plaintiff alleged lack of informed consent in that "the defendants did not explain other test or study options, the risks or benefits of performing additional tests or studies, or the risks or benefits of monitoring her condition." Id. The plaintiff further alleged that the defendants failed to obtain informed consent by their "failure to inform the plaintiff of the results of the lumbar puncture, failure to explain the significance of the lumbar puncture and its findings, failure to explain the significance of the MRI findings, failure to inform the plaintiff of the risks and benefits of additional tests or studies, failure to inform the plaintiff of the limitations of the neurological and other examinations that she underwent, failure to provide the correct diagnosis, failure to inform the plaintiff that they had not identified the cause of the plaintiff's headaches, and failure to inform the plaintiff of the benefits of having her condition monitored." Id. The plaintiff alleged that the defendants' conduct caused a delayed diagnosis, which led to her blindness, and that "had she been properly informed, she would have undergone additional tests, studies and monitoring; id.; and "would have explored other options to identify the source of her headaches, thereby preventing her blindness." Id.

Seven of the defendants moved to strike the informed consent claims. The court in *Glover* examined case law from other jurisdictions and granted the motion to strike, stating: "In the present case, the plaintiff's claims differ from the descriptions of the cause of action for lack of informed consent as articulated in [Connecticut appellate cases]. Here, there is no allegation that the defendants failed to inform the plaintiff of the particular risks or alternatives associated with a certain treatment or procedure. Instead, the plaintiff's claims are based on allegations that the defendants failed to inform her

of the limitations, results, findings, or significance of her CT scan, MRI, lumbar puncture and examinations, and that the defendants failed to inform her of *additional* tests or studies that were available. The plaintiff does not allege any failure to inform the plaintiff of the risks or alternatives associated with undergoing the CT scan, MRI or lumbar puncture, but rather, she alleges a failure to inform her of *other* test or study options, the risks or benefits of performing *additional* tests or studies, and the risks or benefits of *monitoring* her condition. Thus, the plaintiff's informed consent claims are devoid of any allegations of a failure to inform her of the risks or alternatives associated with a particular treatment or procedure that she received, and, as such, fail to assert the requisite elements of this cause of action as set forth by Connecticut cases.

"Moreover, inextricably linked to the plaintiff's informed consent claim is the allegation that the defendants failed to inform her about the appropriate or correct treatment, test or diagnosis. This allegation distorts the informed consent claim because it would require the court to extend the informed consent doctrine to require a physician to inform a patient of conditions which a doctor either fails to diagnose or diagnoses incorrectly." (Emphasis in original.) Id., 530.

The court in *Glover* went on to state: "[T]he plaintiff's lack of informed consent claims are essentially premised on the allegation that the defendants failed properly to test for or to make a diagnosis of a condition which led to her blindness. As such, although the plaintiff may have properly set forth claims of negligence . . . her allegations are legally insufficient to support the counts asserting lack of informed consent." Id.

In the present case, Jason Rich and Keri Rich allege that the defendants failed to interpret Keri Rich's fetal ultrasound study properly and failed to inform Jason

Rich and Keri Rich of the results of the prenatal test and the significance of prenatal testing. Similar to the facts in *Glover*, Jason Rich and Keri Rich are not alleging that the defendants failed to inform them of the risks related to Keri Rich undergoing a fetal ultrasound study or the alternatives to such a procedure, but instead are alleging that the defendants failed to inform Jason Rich and Keri Rich properly of the results of the study and the significance of prenatal testing. If a physician misdiagnoses a prenatal test, it is materially different from knowing something regarding the nature, risks or benefits of a particular procedure or alternatives to that procedure and failing to disclose it to the patient. As a result, a claim of lack of informed consent cannot be supported in this case. Therefore, the motion to strike count two of the complaint is granted in its entirety.

C

Wrongful Life—Count Three

1

History of Wrongful Life Claims

"'Wrongful life' generally refers to actions brought on behalf of children, as distinguished from 'wrongful birth,' which generally refers to actions brought by parents. . . . In a wrongful life claim '[t]he child does not allege that the physician's negligence caused the child's deformity. Rather, the claim is that the physician's negligence—his failure to adequately inform the parents of the risk—has caused the birth of the deformed child. The child argues that but for the inadequate advice, it would not have been born to experience the pain and suffering attributable to the deformity.' " (Citation omitted.) *Woodruff* v. *Hoffman*, Superior Court, judicial district of Fairfield, Docket No. 196095 (December 9, 1983) (*Jacobson, J.*) (10 Conn. L. Trib. No. 15, pp. 12–13).

Recovery for economic damages for a wrongful life cause of action was first recognized by the California Supreme Court in 1982. See *Turpin* v. *Sortini*, 31 Cal. 3d 220, 228–39, 643 P.2d 954, 182 Cal. Rptr. 337 (1982). The Supreme Courts of Washington and New Jersey followed the *Turpin* analysis in 1983 and 1984, respectively, in *Harbeson* v. *Parke-Davis, Inc.*, 98 Wn. 2d 460, 479–83, 656 P.2d 483 (1983), and *Procanik* v. *Cillo*, 97 N.J. 339, 351–55, 478 A.2d 755 (1984). "No other appellate court has agreed with [*Turpin, Harbeson* and *Procanik*]." *Kassama* v. *Magat*, 368 Md. 113, 147, 792 A.2d 1102 (2002). "[T]he vast majority of jurisdictions that have considered wrongful life claims similar [to wrongful life claim of child born with spina bifida] have refused to recognize them." *Hester* v. *Dwivedi*, 89 Ohio St. 3d 575, 581, 733 N.E.2d 1161 (2000). Even the Supreme Courts of California, Washington and New Jersey, which have recognized wrongful life causes of action, have declined to recognize a claim for noneconomic damages in connection with such a cause of action. E.g., *Turpin* v. *Sortini*, supra, 237–39; *Procanik* v. *Cillo*, supra, 349–55; *Harbeson* v. *Parke-Davis, Inc.*, supra, 479–82.

"To date, no Connecticut Supreme Court decision addresses the propriety of a claim for 'wrongful life.' " *Woodruff* v. *Hoffman*, supra, 10 Conn. L. Trib. No. 15, pp. 12–13. In Connecticut, there are no appellate decisions regarding wrongful life causes of action but there are Superior Court decisions that address wrongful life. Among the five reviewed, by this court, there is a split as to whether to recognize wrongful life as a cause of action. Wrongful life was clearly recognized as a legal claim in *Woodruff*. In *Ahsan* v. *Olsen*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 314430 (November 9, 1987) (*Wagner, J.*) (3 C.S.C.R. 55–56), the court, relying on *Woodruff*, noted that Connecticut was one of only five jurisdictions to

have recognized a wrongful life cause of action. In the absence of a definitive ruling by the Appellate Court or Supreme Court as to the existence of a wrongful life cause of action in Connecticut, the trial court looked to the count of the complaint sounding in wrongful life for sufficient facts to support such a cause of action. Although the court in *Ahsan* assumed arguendo that such a cause of action existed in Connecticut, the court in *Ahsan* determined that the minor plaintiff failed to allege that the defendants' negligence caused his birth, "which is the essential allegation in such cause of action." Id., 56. Therefore, the court granted the motion to strike the count of the complaint sounding in wrongful life.

In *Donnelly* v. *Candlewood Obstetric-Gynecological Associates, P.C.*, Superior Court, judicial district of Danbury, Docket No. 302096 (June 8, 1992) (*Moraghan, J.*) (6 Conn. L. Rptr. 532), the minor plaintiff alleged wrongful life in a complaint after his parents were allegedly informed by the defendants, who had performed several prenatal tests, "that although the [fetus'] liver was not in the correct position, [the plaintiff mother] would otherwise give birth to a normal child." Id. Allegedly, on the basis of this information, the plaintiff mother carried the minor plaintiff to term. The minor plaintiff, however, was allegedly born with multiple defects. Here, the court refused to recognize wrongful life as a cause of action, stating that "[a]s a result of the philosophical problems inherent in a cause of action for wrongful life not being amenable to resolution in a court of law, this court declines to recognize such an action." Id. The inherent problem referred to by the court is the philosophical dilemma of comparing the value of life in an impaired state to no life at all. This rationale of *Donnelly* is firmly grounded in the out-of-state opinions refusing to recognize wrongful life as a cause of action, but the *Donnelly* court did not address

the reasoning of the unreported *Woodruff* opinion or analogize the Connecticut Supreme Court's reasoning for recognizing wrongful birth as a cause of action in *Ochs* to a wrongful life cause of action.[5]

Fifteen years later after *Donnelly*, in *Quinn* v. *Blau*, Superior Court, judicial district of Danbury, Docket No. CV-96-325691-S (December 12, 1997) (*Stodolink, J.*) (21 Conn. L. Rptr. 126, 130–31), the Superior Court looked to *Woodruff, Ahsan* and *Ochs* in recognizing a cause of action in wrongful life. In *Chamberland* v. *Physicians for Women's Health, LLC*, supra, 40 Conn. L. Rptr., 737, 739 n.2, the trial court granted the defendant's motion in limine to preclude evidence regarding the minor plaintiff's wrongful life claim.

2

Analysis of Wrongful Life Claims

The Illinois Supreme Court has determined that courts have had two primary bases for rejecting a claim for wrongful life. The first basis was "the courts' unwillingness to hold that a child can recover damages for achieving life. The threshold problem has been the assertion by the infant plaintiffs not that they should not have been born without defects, but that they should not have been born at all. The essence of the infant's cause of action is that the negligent conduct of the defendants deprived the child's mother from obtaining an abortion which would have terminated its existence. Resting on the belief that human life, no matter how burdened, is, as a matter of law, always preferable to nonlife, the courts have been reluctant to find that the infant has suffered a legally cognizable injury by being born with a congenital or genetic impairment as opposed to not being born at all." *Siemieniec* v.

---

[5] The court in *Donnelly* did, however, acknowledge *Turpin, Procanik* and *Harbeson*.

*Lutheran General Hospital,* 117 Ill. 2d 230, 239–40, 512 N.E.2d 691 (1987). The second basis that the Illinois Supreme Court determined that the courts had for rejecting a wrongful life claim was "the difficulty, if not impossibility, of measuring appropriate damages. The traditional tort remedy is compensatory in nature. The basic rule of tort compensation is that the plaintiff be put in the position that he would have been in absent the defendant's negligence. The damages recoverable on behalf of a child for wrongful life are limited to those necessary to restore the child to the position he would have occupied were it not for the alleged malpractice of the physician or other health-care provider. In a wrongful life case, there is no allegation that but for the defendant's negligence the child would have had a healthy, unimpaired life. Instead, the claim is that without the defendants' negligence, the child never would have been born. Thus, the cause of action involves a calculation of damages dependent upon the relative benefits of an impaired life as opposed to no life at all, [a] comparison the law is not equipped to make." (Internal quotation marks omitted.) Id., 240.

One step involved in analyzing a wrongful life claim is establishing that a legally cognizable injury exists. "In every professional malpractice action, the plaintiff is required to prove that (1) the defendant was obligated to conform to a recognized standard of care, (2) the defendant deviated from that standard, (3) the plaintiff suffered some injury, and (4) the defendant's act in departing from the standard of care caused the plaintiff's injury." (Internal quotation marks omitted.) *Sherman* v. *Bristol Hospital, Inc.,* 79 Conn. App. 78, 88 n.6, 828 A.2d 1260 (2003). One problem with allowing a wrongful life claim to proceed lies in proving that Sydney Rich suffered a legally cognizable injury by being born, given the reluctance of many courts in finding that being born is a legally cognizable injury. See, e.g.,

*Siemieniec* v. *Lutheran General Hospital*, supra, 117 Ill. 2d 239–40.

The New Jersey Supreme Court best characterized the rationale of the small minority in recognizing a claim of wrongful life by stating, "Our decision to allow the recovery of extraordinary medical expenses is not premised on the concept that non-life is preferable to an impaired life, but is predicated on the needs of the living. We seek only to respond to the call of the living for help in bearing the burden of their affliction." *Procanik* v. *Cillo*, supra, 97 N.J. 353. However, in a negligence action, the plaintiff needs to prove he suffered an " 'actual injury.' " *Silano* v. *Cumberland Farms, Inc.*, 85 Conn. App. 450, 453, 857 A.2d 439 (2004). Thus, if the minority of courts that have awarded economic damages for "wrongful life" have not been able to establish that being born constitutes an injury, this court will not follow these courts in recognizing wrongful life as a cognizable cause of action. Sydney Rich needs to claim an "actual injury"; see id.; and this requirement is not fulfilled by a failure to not exist.

Another step involved in analyzing wrongful life claims is establishing damages. There are "economic damages" such as "medical care, rehabilitative services, custodial care and loss of earnings or earning capacity" and "noneconomic damages" such as "physical pain and suffering and mental and emotional suffering . . . ." General Statutes § 52-572h. These are compensatory damages whose purpose is "to restore an injured party to the position he or she would have been in if the wrong had not been committed." (Internal quotation marks omitted.) *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 248, 905 A.2d 1165 (2006), quoting *Kenny* v. *Civil Service Commission*, 197 Conn. 270, 276, 496 A.2d 956 (1985). However, assessing damages for "wrongful life" does not follow from the logic surrounding compensatory damages because "we cannot appraise the

value of . . . nonexistence for purposes of comparing it with . . . impaired existence." *Lininger* v. *Eisenbaum*, 764 P.2d 1202, 1210 (Colo. 1988). Sydney Rich cannot be restored to a position of nonexistence.

Even the *Turpin* court, which found wrongful life to be a legally cognizable claim, declined to award general (noneconomic damages) due to the impossibility of determining whether the minor plaintiff has suffered an injury in being born with impairments and due to the impossibility of assessing general damages in a nonspeculative fashion. *Turpin* v. *Sortini*, supra, 31 Cal. 3d 235. In *Lininger* v. *Eisenbaum*, supra, 764 P.2d 1212, the Colorado Supreme Court concluded that the Supreme Courts of California, Washington and New Jersey "chose to disregard the child's failure to prove an injury in light of [their] perception that the equities of permitting the child to recover special damages were entitled to greater weight."

In this case, Sydney Rich is alleged to have suffered a legally cognizable injury by being born impaired as opposed to not being born at all. If the purpose of awarding compensatory damages to Sydney Rich is to put her back in the position she would have been in were it not for the defendants' alleged negligence, this position would be nonexistence, which cannot be said to be of greater value than being born impaired; implicit in finding otherwise is that the minor plaintiff is currently more valuable or better off dead than alive.

Furthermore, Jason Rich and Keri Rich still have a cause of action sounding in wrongful birth against the defendants; therefore, if the defendants are found to be liable in that cause of action, they can still make amends. In terms of more ascertainable economic damages, there is no reason why the parents of a severely disabled child, as Sydney Rich is alleged to be, could not recover the premajority and postmajority economic

costs of supporting the child under a wrongful birth claim instead of a under a duplicative wrongful life claim. The economic recovery afforded to parents under a wrongful birth claim thereby addresses the public policy concerns that could motivate a court to allow a child to recover economic damages for a wrongful life claim.

Another problem that can be encountered in allowing causes of action sounding in wrongful life to proceed is analogous to the issue of causation in wrongful birth claims, as both causes of action involve proving that the negligence of the physician(s) and, or, other medical providers was the proximate cause of the minor's defects. The following has been stated with regard to wrongful birth claims: "The heart of the problem in these cases is that the physician cannot be said to have caused the defect. The disorder is genetic and not the result of any injury negligently inflicted by the doctor. In addition it is incurable and was incurable from the moment of conception. Thus the doctor's alleged negligent failure to detect it during prenatal examination cannot be considered a cause of the condition . . . . The child's handicap is an inexorable result of conception and birth." *Wilson* v. *Kuenzi*, 751 S.W.2d 741, 744–45 (Mo.), cert. denied, 488 U.S. 893, 109 S. Ct. 229, 102 L. Ed. 2d 219 (1988), quoting *Becker* v. *Schwartz*, 46 N.Y.2d 401, 418, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978) (Wachtler, J., dissenting in part). This court finds that this reasoning can also be applied in disallowing wrongful life claims. In the present case, the defendants are not alleged to have caused Sydney Rich's Dandy-Walker syndrome, but it is alleged that because of the defendants' negligence, Keri Rich continued her pregnancy to term and Sydney Rich was able to be born in a severely disabled state.

Recognizing a claim for wrongful life can also be problematic because any theoretical fetal rights either

to come to term or not are subject to the mother's legal rights pertaining to control of her pregnancy. See *Roe* v. *Wade,* supra, 410 U.S. 113. If a pregnant mother chooses not to have an ultrasound or amniocentesis, should her child be able to have a cause of action against the mother? If the mother chooses not to terminate her pregnancy after discovering her fetus has Dandy-Walker syndrome, Down's syndrome or any other fetal abnormality, should the child be able to have a cause of action against the mother? In fact, the Connecticut Supreme Court's recognition of a wrongful birth claim in *Ochs* was predicated on "a constitutionally protected interest located within the zone of privacy created by several fundamental constitutional guarantees . . . ." (Citations omitted; internal quotation marks omitted.) *Ochs* v. *Borrelli,* supra, 187 Conn. 258. In short, should a child be able to make a claim against his or her mother if the child is born with an impairment that was detectable during pregnancy? In these cases against the mother, the minor plaintiff would still be using the following language found in *Woodruff* v. *Hoffman,* supra, 10 Conn. L. Trib. No. 15, p. 13, and *Quinn* v. *Blau,* supra, 21 Conn. L. Rptr. 130: "I'd rather not be suffering as I am, but since your wrongful conduct preserved my life, I am going to take advantage of my regrettable existence to sue you." (Internal quotation marks omitted.) Just as the child rightfully does not have a claim against the mother for bringing her pregnancy to term, the child should not have a claim against the physicians and other health care providers when instead, they are the alleged proximate cause of the pregnancy not being terminated.

Sydney Rich did not suffer legally cognizable injuries that were proximately caused by the defendants in being born with imparities as opposed to not being born at all. Being born with a handicap instead of not being born is not a legally cognizable injury. Damages for living life with impairments are damages that cannot

be calculated or, alternatively, are ones already recoverable under a wrongful birth action. Therefore, this court finds that a claim for wrongful life is not legally cognizable and, thus, grants the motion to strike count three of the complaint.

V

CONCLUSION

The motion to strike paragraph twenty-six of count one is denied. The motion to strike counts two and three is granted. The court need not address the motion to strike paragraph twenty-six of count two.